IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **TERRY WILSON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:20-cv-02059-G** |
| **L&B REALTY ADVISORS, LLP and** | § | |
| **GEORGE ANDREWS SMITH,** | § | |
| **Individually,** | § | |
| | § | |
| Defendants. | § | |

---

### PLAINTIFF'S BRIEF IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................2

**TABLE OF AUTHORITIES** .........................................................................4

**I.     SUMMARY OF THE ARGUMENT** ...............................................7

**II.    RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**................9

    A.   Background of Wilson ........................................................................9

    B.   Wilson is employed by L&B upon the recommendation of his former client contact at APFC, Rosemarie Duran. ...........................................10

    C.   Defendants keep close tabs on employees nearing retirement age and those who request FMLA leave and appear on reports of "High-Cost Claimants" in its self-insured medical plan. ...........................................11

    D.   Wilson completes his "Succession Plan" in 2017.................................12

    E.   Structure of the Retail Asset Management Department and division of labor therein ...............................................................................14

    F.   Wilson's desire to continue working for 5-6 years does not align with Defendant Smith's "vision" for catering to the "next gen." ..................15

    G.   L&B begins enacting its "vision" for catering to the "next gen" .........16

    H.   Wilson informs L&B of his cancer diagnosis, and he takes FMLA leave. ..........18

    I.   L&B terminates Wilson under the guise of a "position elimination," and then completes Smith's "vision" for the "next gen".............................19

**III.   ARGUMENTS AND AUTHORITIES**.............................................21

    A.   All inferences are to be drawn in favor of the non-movant, with facts considered in the light most favorable to him....................................21

    B.   L&B's catering to the "next gen" and Wilson's retirement timeline not aligning with its "vision" provides direct evidence that would support a jury finding of age discrimination.......................................................22

    C.   Circumstantial evidence also establishes age discrimination ...............24

        1.   Substantial evidence supports that Wilson was replaced by a significantly younger employee................................................26

        2.   Substantial evidence supports that Wilson was otherwise discharged because of his age.................................................28

        3.   Defendants' proffered reason for terminating Wilson is false and merely a pretext for age discrimination. ...................................29

> *a.*     *Genuine issues of fact exist on whether Wilson's position was eliminated – and on whether there was any real need to eliminate it.* ................................................................30
>
> *b.*     *Equivocal and false reasons for terminating Wilson establishes pretext.* ........................................................34
>
> *c.*     *The same-actor inference does not conclusively rebut a prima facie case, and should not apply where inferences are to be drawn in the non-movant's favor.* ..................................37

D.     Wilson's disability discrimination claim should be tried to a jury. .....................38

    1.     Substantial evidence exists that Wilson was replaced by and treated less favorably than non-disabled employees.................................39

    2.     Genuine issues of material fact exist regarding the timing of the decision to eliminate Wilson's position.....................................41

    3.     L&B's proffered reason for terminating Wilson is false and merely a pretext for disability discrimination.............................43

E.     Wilson's FMLA retaliation claim should be tried to a jury.................................44

    1.     Wilson can establish a prima facie case of FMLA retaliation. .................45

    2.     Wilson can establish a causal connection between his FMLA leave and his termination merely two months later. ..............................46

    3.     Additional evidence establishes a causal connection between Wilson's FMLA leave and his termination.................................47

    4.     Defendants' proffered reason for terminating Wilson is false and merely a pretext for FMLA retaliation.......................................48

F.     Wilson's ERISA claim should be tried before a jury. ...........................................49

    1.     Wilson can establish that Defendants had the specific intent to interfere with his ERISA Benefits. ...........................................50

    2.     A genuine issue of fact exists concerning Defendants' knowledge of Wilson's diagnosis and need for additional treatment at the time they decided to terminate him................................51

    3.     The alleged "elimination" of Wilson's position was merely pretext for Defendants to save on future health insurance costs...............52

**IV.**     **CONCLUSION AND PRAYER** ......................................................................54

| TABLE OF AUTHORITIES |
|:---:|

### CASELAW

*Acker v. Deboer, Inc.*, 429 F. Supp 2d 828 (N.D. Tex. 2006) ......................................................22

*Amsel v. Texas Water Development Board*, 464 F. App'x 395 (5th Cir. 2012) ..........................46

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................22

*Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988) ......................................22

*Bodine v. Employers Casualty Co.*, 352 F.3d 245 (5th Cir. 2003) ..............................................49

*Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) ......................................................37

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................................21

*Coblentz v. Glickman*, No. 98-3645, 1999 U.S. Dist. LEXIS 15851,1999 WL 816266
(E.D. La. Oct. 13, 1999)................................................................................................................38

*Evans v. Houston*, 246 F.3d 344 (5th Cir. 2001) ........................................................................46

*Garcia v. Professional Contract Services*, 938 F.3d 236 (5th Cir. 2019)..............................47, 49

*Goudeau v. National Oilwell Varco LP*, 793 F.3d 470 (5th Cir. 2015)........................................25

*Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461 (5th Cir. 1989) ..............................23

*Harp v. Cooke County Texas*, No. 4:17-CV-748, 2018 WL 6617637
(E.D. Tex. Dec. 18, 2018)..........................................................................................26, 29, 34, 37

*Huan v. Ideal Industries, Inc.*, 81 F.3d 541 (5th Cir. 1996) ......................................................37

*Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757 (5th Cir. 2001)....................................44

*Ion v. Chevron USA, Inc.*, 731 F.3d 379 (5th Cir. 2013) ............................................................44

*Jones v. R.G. Barry Corp.*, No. 16-cv-154 (RCL), 2017 WL 1049566
(W.D. Tex. Mar. 17, 2017) ............................................................................... 26, 29, 34, 37-38

*Kibbie v. Hays Consolidated ISD*, No. A-19-CV-393-SH,
2020 U.S. Dist. LEXIS 60844, 2020 WL 1695688 (W.D. Tex. Apr. 7, 2020) .....................47, 49

*Lawson v. Graphic Packaging Int'l, Inc.*, 549 Fed. App'x 253 (5th Cir. 2013)............................38

*Lindsey v. Prive Corp.*, 987 F.2d 324, 328 (5th Cir. 1993) ...........................................22

*Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887 (E.D. Tex. 2004) .....................38

*Long v. Eastfield College*, 88 F.3d 300 (5th Cir. 1996).................................................22

*Machinchick v. PB Power, Inc.*, 398 F.3d 345 (5th Cir. 2005)........................... 22-23, 25

*Montes v. Phelps Dodge Industries*, 481 F. Supp. 2d 700 (W.D. Tex. 2006) ......... 49-50

*Morris v. Texas HHS Commission*, 2019 U.S. Dist. LEXIS 133737
(S.D. Tex. Aug. 8, 2019)............................................................................................44, 46

*Moss v. BMC Software, Inc.*, 610 F.3d 917 (5th Cir. 2010) .........................................25

*Nero v. Industrial Molding Corp.*, 167 F.3d 921 (5th Cir. 1999) ...................... 50-51, 53

*Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 217CV00123JRGRSP,
2018 WL 3375192 (E.D. Tex. July 11, 2018) ...............................................................22

*Palasota v. Haggar Clothing Co.*, No. 3:00-CV-1925-G,
2001 U.S. Dist. LEXIS 15161 (N.D. Tex. Sept. 25, 2001)............................................28

*Parker v. Hahnemann Univ. Hosp.*, 234 F. Supp. 2d 478 (D.N.J. 2002) .....................45

*Paulissen v. Mei Techs., Inc.*, 942 F. Supp. 2d 658 (S.D. Tex. 2013) ..............25, 29, 34

*Rachid v. Jack In The Box, Inc.*, 376 F.3d 305 (5th Cir. 2004) ....................................23

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)..........................23, 37

*Richard v. Cingular Wireless LLC*, 223 F. App'x 334 (5th Cir. 2007) ........................46

*Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327 (5th Cir. 2005)............................44

*Schutze v. Financial Computer Software*, No. 3:04-CV-0276-H,
2006 U.S. Dist. LEXIS 73734, 2006 WL 2842008 (N.D. Tex. Sept. 29, 2006) ...................38, 49

*Scott v. BP Amoco Chemical Co.*, No. V-06-79, 2008 U.S. Dist. LEXIS 23594
(S.D. Tex. Mar. 25, 2008).............................................................................................38

*Taylor v. Union Institute*, 30 Fed. App'x 443 (6th Cir. 2002).....................................45

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) .................25

*Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633 (5th Cir. 1985)..................22, 25

*Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887 (5th Cir. 2012) ...................................................25

*Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441 (1st Cir. 2009) ....................................34

*Villalon v. Del Mar College District*, No. C-09-252, 2010 U.S. Dist. LEXIS 82766
(S.D. Tex. 2010)........................................................................................................................44

*Wilson v. Noble Drilling Services, Inc.*, 405 F. App'x 909 (5th Cir. 2010) ..................................46

**STATUTES, REGULATIONS, AND RULES**

29 U.S.C § 1140.........................................................................................................................49

29 U.S.C. § 2615(a)(2)...............................................................................................................44

29 C.F.R. § 825.220....................................................................................................................44

FED. R. CIV. P. 56(a)...................................................................................................................22

**COMES NOW**, Plaintiff Terry Wilson ("**Plaintiff**" or "**Wilson**" herein) and files this, his *Brief in Support of his Response in Opposition to Defendant's Motion for Summary Judgment* (the "**Response Brief**" herein) and, in support of same, would respectfully show the court as follows:

## I. SUMMARY OF THE ARGUMENT

Defendants' Motion for Summary Judgment should be denied because substantial fact issues exist where the jury could find that:

- Wilson, at 64 years of age, six years of tenure at L&B, and over 30 years of experience in asset management, was terminated while less qualified and significantly younger employees were instead retained and replaced Wilson, specifically:

  - Peter Aburrow (age 37 and only nine years of asset management experience when Wilson was terminated, and only hired the year before);

  - Will Ellis (age 37 and only seven years of asset management experience); and

  - Michael Formanek (age 37 and only ten years of asset management experience, and only hired two years before).

- Wilson was replaced by significantly younger and non-disabled asset managers, who were promoted three days after Wilson was terminated, promoted again six months later to a title that carried with it no differences in duties from Wilson, and replaced Wilson in the profit sharing plan within eight months.

- Wilson's age was a motivating factor in his termination due to CEO Andy Smith saying that Wilson's intent to retire in five to six years did not "work" for the company after professing a desire to cater to the "next gen," especially after L&B's

novice, untrained HR Director reported to the Management Committee the ages of employees nearing Medicare age.

- Wilson was terminated barely *nine weeks* after returning from FMLA leave to treat his prostate cancer and after being placed on L&B's list of "high cost claimants" in its self-funded medical insurance plan, and the evidence otherwise shows the decision was actually made either *during his leave or within one month of his return*, thus demonstrating retaliation for his FMLA leave in violation of the protections afforded by ERISA.

- L&B departed from its established practice of not eliminating positions and temporarily transferring employees in slow areas to busy areas until business increased.

- Defendants' proffered explanation for terminating Wilson is unworthy of credence and the actual reason for his termination is because of his age, disability, FMLA leave and position as a "high cost claimant" in L&B's self-funded medical plan.

- Defendants have since abandoned all but one of the reasons for terminating Wilson that they initially reported to the Texas Workforce Commission – none stand up to the contradictory evidence obtained in discovery showing they were false – leaving Defendants with only the nebulous claim of needing to eliminate his position due to a reduction in retail assets, which similarly fails scrutiny.

- No documents or notes exist showing that any discussion about the need to eliminate Wilson's position, nor any discussion or decision on it at the February 2019 Management Committee Meeting or beforehand; rather – at the earliest – the minutes of the April 2019 Management Committee Meeting cryptically reflect a

discussion on "realignment" occurred, notably after Wilson's disclosure of cancer and after his FMLA leave and increased medical costs began.

- The alleged need to eliminate Wilson's position is contradicted by the fact that his supervisor was already in the midst of his planned retirement and Defendants had recently hired the significantly younger Aburrow and Formanek, and went on to hire another asset management employee, despite the alleged downturn of L&B's retail assets.

For these and the reasons more fully stated below, Defendants' Motion for Summary Judgment should be denied in its entirety.

## II. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS [1]

### A. BACKGROUND OF WILSON

1.    Wilson was sixty-four (64) years of age when he was terminated [*see* Wilson's Original Complaint, Doc. No. 1, at 2 ¶ 8 (alleging Wilson was 64 at the time his employment ended); *see also* Smith's Original Answer, Doc. No. 8, at 2 ¶ 8 (admitting to same); *see also* L&B's Original Answer, Doc. No. 9, at 2 ¶ 8 (same)]. Wilson had over thirty years of experience managing assets at the time of his termination [*see* APP 425-426]. Wilson formerly worked for LaSalle Investment Management as a Director in the asset management department until LaSalle closed the doors of its Dallas office, where Wilson worked, in 2011 [*see* APP 425-426; *see also* APP 451].

---

[1]    Substantial additional evidence has been sought as part of Plaintiff's pending Motion to Compel [Doc. No. 43], which includes the issue of whether the search terms – which Defendants have only provided *today* after being requested for several months – used to locate responsive documents truly resulted in complete production of all material documents requested by Wilson.

**B.    WILSON IS EMPLOYED BY L&B UPON THE RECOMMENDATION HIS FORMER CLIENT CONTACT AT APFC, ROSEMARIE DURAN**

2.      Wilson's former client, Rosemarie Duran of the Alaska Permanent Fund Corporation (APFC), offered to inquire about a job opening for Wilson at L&B and recommended his employment with L&B [*see* APP 93 (Duran Depo 70:13-22); *see also* APP 451].  APFC is one of L&B's largest clients [*see* APP 347]. Shortly thereafter, Smith reached out to Wilson about his interest working for L&B [*see* APP 13-14 (Wilson Depo 49:6-50:18); *see also* APP 450].

3.      Wilson accepted L&B's Offer of Employment on January 8, 2013, and began working for L&B as the Director of its Retail Asset Management Department on February 1, 2013 [*see* APP 259]. Due to Wilson's strong performance with L&B, on January 1, 2016, Wilson was promoted to Vice President of the Retail Asset Management Department – a position which he held until the time of his termination [*see* APP 260; *see also* APP 15-16 (Wilson Depo 59:23-60:5)].

4.      Throughout his tenure, Wilson received excellent performance reviews indicating that he was a "solid performer who meets all of L&B's high expectations of performance standards and sometimes exceeds requirements" [*see* APP 260; *see also* APP 44-45(Dinan Depo 51:24-52:10)]. There is no dispute that Wilson was widely acknowledged as one of the most experienced asset managers in the Retail Asset Management Department [*see* APP 178-179 (Smith Depo 189:19-190:1); *see also* APP 118 and 133-134 (Plumlee Depo 104:3-12 and 158:18-159:3)]. During his time at L&B, Wilson was invited to participate in the Partners Driving Performance Equity Plan ("PDP") – a program designed to provide equity-based incentive compensation to **key** employees [*see* APP 433]. Additionally, Wilson worked with the Leadership Council and was asked to be a mentor in L&B's Mentoring Program, having been recognized as one of the "leaders"

of the company [*see* APP 59-61 and 76 (Dinan Depo 124:22-126:4 and 183:17-25); *see also* APP 266].

5.        During the entirety of his employment, Wilson directly reported to John Gerdes, L&B's Executive Vice President of Retail Asset Management [*see* APP 15 (Wilson Depo 59:19-22); *see also* APP 285]. At the time of Wilson's termination, there were three less-experienced asset managers in the retail asset department as well, all of whom were under 40 at the time of Wilson's termination: Michael Formanek (DOB 10/02/1981), Peter Aburrow (DOB 07/10/1981), and William Ellis (12/12/1981) (collectively referred to herein as the "**Next Gen**") [*see* APP 453].

C.     **DEFENDANTS KEEP CLOSE TABS ON EMPLOYEES NEARING RETIREMENT AGE AND THOSE WHO REQUEST FMLA LEAVE AND APPEAR ON REPORTS OF "HIGH- COST CLAIMANTS" IN ITS SELF-INSURED MEDICAL PLAN**

6.        L&B, with the assistance of Holly Dinan, its Vice President of Human Resources,[2] routinely monitored L&B's workforce for individuals approaching the "Medicare age" of 65 years old [*see* APP 39 and 63 (Dinan Depo 32:18-23 and 128:5-18)]. Once these individuals had been identified, Dinan relayed the information to the Management Committee, of which she was also a member, in an effort to identify "**those people as posing a risk to L&B**" [*see* APP 36-37 and 62-64 (Dinan Depo 21:24-22:4, 127:23-128:18 and 129:2-11)]. The ages and retirement plans of older leaders was a constant topic of discussion at the Management Committee meetings since 2016, when Dinan first reported the relative workforce age to the Management Committee [*see* APP 65-66 (Dinan Depo 130:5-24 and 131:15-21)].

7.        L&B also provides employees with medical insurance through a self-funded insurance plan [*see* APP 53 (Dinan Depo 105:19-20)].  Dinan regularly met with Plumlee and

---

[2]     Prior to working for L&B, Dinan had no work experience in human resources, nor had she received any schooling or formal training in HR procedure [*see* APP 40-42 (Dinan Depo 36:6-38:4)]. At the time of Wilson's termination, Dinan had only an HR generalist certificate which she received after attending a one-and-a-half-day training course [*see* APP 40-41 (Dinan Depo 36:20-37:19)].

L&B's insurance brokers regularly to review a chart listing the company's "high-cost claimants" (known as iCAF reports) and make decisions about L&B's medical insurance spend [*see* APP 148-149-153 (Plumlee Depo 232:14-22, 233:22-25, 236:16-18, 237:9-16, 238:23-239:1)].  From time to time, Dinan has presented the Management Committee with reports on the cost of L&B's self-insurance [*see* APP 57-58 (Dinan Depo 115:19-116:9)].

8. Though the iCAF reports do not list employees by name, the chart provides the gender, four-year age range, and detailed, specific medical condition responsible for the high spend [*see* APP 378]. Dinan admitted that, while the names of the employees are not present on the iCAF report, it was easy for her to figure out who those employees were, "especially if…they have requested FMLA" [*see* APP 70-71 (Dinan Depo 142:19-143:3)]. Dinan also admitted that Wilson's condition would certainly have made him a high-cost claimant [*see* APP 69 (Dinan Depo 140:10-13)].

9. One of Dinan's primary goals for several years prior to Wilson's termination was the "reduction of employer medical spend" [*see* APP 301; *see also* APP 299].  In November 2019, four months after Wilson's termination, Dinan celebrated having successfully reduced L&B's overall employer medical spend in her annual performance evaluation [*see* APP 299].[3]

## D.   WILSON COMPLETES HIS SUCCESSION PLAN IN 2017

10. In 2017, L&B's Vice President of Human Resources, Holly Dinan (f/k/a Holly Schneider) requested the succession plans of various employees, including Wilson and Gerdes [*see* APP 353; *see also* APP 36-37 (Dinan Depo 21:7-22:15)]. Succession planning is allegedly an ongoing priority at L&B due to inquiries concerning succession posed by clients and the "next gen" [*see* APP 427]. While L&B has no written policy dictating who must create a succession

---

[3]   Additional documents regarding Dinan's and others' communications about Defendants' high-cost claimant reports and FMLA requests have been sought as part of Plaintiff's pending Motion to Compel [Doc. No. 43].

plan, when a succession plan should be submitted, or what constitutes an "acceptable" succession plan, it is generally requested of employees "approaching retirement age" (like Wilson) and of department heads (like Gerdes) [*see* APP 43 (Dinan Depo 49:15-20); *see also* APP 164-165 (Smith Depo 148:21-149:1); *see also* APP 108 (Plumlee Depo 36:6-20)].

11.     On May 8, 2017, Wilson submitted his completed succession plan to Dinan in response to her request [*see* APP 355]. Wilson's supervisor, John Gerdes, also submitted his succession plan to Dinan on this date [*see* APP 358]. The succession plans utilized by L&B call for succession planning in the event of two scenarios – one, if someone were to drop dead or get ran over by a bus, and the other, steps that should be taken in the future to ensure continuation of workflow [*see* APP 19 (Wilson Depo 81:8-14)]. The content of Wilson and Gerdes' succession plans were nearly identical – each identifying the other as their logical successor in the event either were "ran over by a bus" [*see* APP 355; *see also* APP 358; *see also* APP 19 (Wilson Depo 81:8-14)].

12.     Dinan, who reviewed the written succession plans, found "no issues with [Wilson]'s succession plan" and never asked for an update or additional information [*see* APP 77-78 and 83 (Dinan Depo 195:18-196:5 and 217:20-22)]. Likewise, Plumlee never advised Wilson that a long-term step-down was unacceptable [*see* APP 141 (Plumlee Depo 222:4-6)].[4] No follow-up conversation about Wilson's succession plan ever occurred, and no step-down plan was ever discussed with Wilson [*see* APP 23-24 (Wilson Depo 92:12-18 and 94:11-16); *see also* APP 169 (Smith Depo 161:19-20); *see also* APP 128-129 and 135 (Plumlee Depo 139:25-140:3 and 160:9-13)].

---

[4]     As is one of the subjects of Plaintiff's pending Motion to Compel [Doc. No. 43], Defendants have thus far refused to produce any other employees' step-down plans other than Gerdes'.

E.    STRUCTURE OF THE RETAIL ASSET MANAGEMENT DEPARTMENT AND DIVISION OF LABOR THEREIN

13.    As Executive Vice President of Retail Asset Management, Gerdes was the head of the retail asset management department at the time of Wilson's termination [*see* APP 285]. Prior to Wilson's termination, Wilson, Ellis, Aburrow, and Formanek all reported to Gerdes [*see* APP 285; *see also* APP 18 (Wilson Depo 65:14-17)].

14.    As head of the Retail Asset Management department, Gerdes had complete authority over the division of assets and labor within the retail asset management department [*see* APP 116-119 (Plumlee Depo 88:25-89:4, 104:13-22 and 105:19-24)]. Retail assets were reallocated "fluidly" among various asset managers, and a reallocation often followed the acquisition, sale, or transfer of retail assets [*see* APP 160 (Smith Depo 134:3-25)]. The number of retail assets assigned to each member of the retail asset management team was also fluid and took into account factors such as labor intensity [*see* APP 398; *see also* APP 205-206 (Corp Rep Depo 39:12-40:18)].

15.    Despite the perceived imbalance of assets between 2015 and 2019, Gerdes never saw the need to reallocate assets between asset managers [*see* APP 25-26 (Wilson Depo 114:25-115:12); *see also* APP 206-207 (Corp Rep Depo 40:22-41:6)]. While Gerdes did manage several large shopping malls, Gerdes had the help of Macerich – a third-party operating partner – who handled many of the day-to-day tasks that an asset manager would typically do [*see* APP 206-209 (Corp Rep Depo 40:22-43:20); *see also* APP 118 (Plumlee Depo 104:13-22)]. Wilson, on the other hand, was assigned assets on which Macerich was not involved, thereby increasing the volume of work needed to be done on assets on a day-to-day basis [*see* APP 398; *see also* APP 208-209 (Corp Rep Depo 42:24-43:20)].

**F.**   **WILSON'S DESIRE TO CONTINUE WORKING FOR 5-6 YEARS DOES NOT ALIGN WITH DEFENDANT SMITH'S "VISION" FOR CATERING TO THE "NEXT GEN"**

16.     On October 16, 2018, a year after Wilson submitted his succession plan to Dinan, Defendant Smith requested a lunch meeting with Wilson, ostensibly to discuss "succession planning" [*see* APP 427; *see also* APP 167 (Smith Depo 156:2-11)]. Defendant Smith stated that the "spot light on this topic [succession planning] has grown even brighter as our [L&B's] clients and our next gen both ask about these plans" [*see* APP 427].

17.     Accordingly, on October 17, 2018, Wilson met with Defendant Smith for lunch [*see* APP 20-23 (Wilson Depo 86:6-87:6 and 91:20-92:11); *see also* APP 167-169 (Smith Depo 156:2-11 and 160:21-161:2)]. During this meeting, Defendant Smith pointedly and unsystematically asked Wilson "how many more years" he wanted to work [*see* APP 167 (Smith Depo 156:2-8); *see also* APP 22-23 (Wilson Depo 91:20-92:11)]. Wilson replied that he would like to continue working until his wife retired, which would occur in approximately five to six years [*see* APP 22-23 (Wilson Depo 91:20-92:3)]. Defendant Smith responded that five to six more years did not work, and that he would follow up with Wilson after the first of the year [*see* APP 22-23 (Wilson Depo 91:20-92:11); *see also* APP 168-169 (Smith Depo 160:18-161:2)]. Wilson asked Smith how long would work for L&B, but Smith never gave him an answer [*see* APP 22-23 (Wilson Depo 91:20-92:18)].

18.     Although Smith has testified that subjects such as retirement are only addressed if brought up in the course of succession planning, Wilson's succession plan never addressed retirement, nor had Wilson ever expressed his intent to retire [*see* APP 161-163 (Smith Depo 141:24-143:14 (retirement only addressed when issue is raised by employee)); *see also* APP 128-129 and 133 (Plumlee Depo 139:8-20 (no need to discuss retirement if not mentioned in succession plan), 140:4-9, and 158:5-6 (Wilson did not ask to retire)); *see also* APP 355]

19.     The **only** topic discussed at Wilson's October 2018 lunch meeting with Smith was his timeline for retirement, which Wilson said would not be for another five to six years, not who would succeed him due some sudden absence [*see* APP 83 (Dinan Depo 217:20-22); *see also* APP 142-143 (Plumlee Depo 223:25-224:13)]. Interestingly, at that time, no other member of the retail asset management department was asked how much longer they envisioned working for L&B [*see* APP 143 (Plumlee Depo 224:14-23)].

20.     Two months after the lunch meeting between Smith and Wilson, Smith attended the December 12, 2018 Management Committee Meeting [*see* APP 251-252; *see also* APP 84 (Dinan Depo 219:23-220:9)]. Under "Succession Planning/Recent Hires/Openings" the minutes from that meeting list an "action item" for Smith to "reengage Terry Wilson to better understand his vision." [*see Id.*]. Smith's "vision" contrasted with the retirement timeline proposed by Wilson, which, according to Plumlee, was "outside of…what we felt was appropriate for the department. Way outside of it" [*see* APP 139-140 (Plumlee Depo 220:16- 221:2); *see also* APP 22-23 (Wilson Depo 91:20-92:3 (Smith stating that Wilson's timeline of retiring in five to six years did not "work" for him and L&B))].

G.     L&B BEGINS ENACTING ITS "VISION" FOR CATERING TO THE "NEXT GEN"

21.     L&B claims that it eliminated Wilson's position due to a significant decrease of retail assets that started in 2015 [*see* APP 347; *see also* APP 120 (Plumlee Depo 106:8-11)]. Between 2014 and 2018, L&B hired three new employees to the Retail Asset Management Department. First, on March 3, 2014, L&B hired Will Ellis as a Retail Analyst, who was later promoted to Retail Asset Manager on August 1, 2017 [*see* APP 322; *see also* APP 328]. Second, on January 19, 2017, L&B hired Michael Formanek as a Retail Asset Manager [*see* APP 306; *see also* APP 309]. Finally, in 2018, L&B hired Peter Aburrow as a Retail Asset Manager [*see* APP 313].

22.     L&B hired Formanek and Aburrow during the height of the alleged decline of retail assets [*see* APP 171-173 (Smith Depo 166:5-8 and 168:23-169:1); *see also Defendants' Appendix in Support of Motion for Summary Judgment*, Doc. No. 36, APP 136-137 ¶ 8-16]. During this time, L&B acquired only one new retail asset [*see Defendants' Appendix in Support of Motion for Summary Judgment*, Doc. No. 36, APP 137 ¶ 12]. And their hiring was despite a practice of not hiring new employees into departments showing declining sales [*see* APP 123 (Plumlee Depo 117:15-20)].

23.     Although there was a gradual decline of retail assets during Wilson's tenure, L&B found it necessary to retain the three younger, less-experienced employees in the retail asset management department [*see* ¶ 21-22]. Further, while Wilson was ultimately removed from the APFC Kukui Marketplace asset in 2018, this change was not made at the request of APFC [*see* APP 94-97 (Duran Depo 79:25-80:16 and 83:23-84:5)]. APFC Representative Rose Duran testified that she never requested the removal of Wilson from Kukui Marketplace [*see* APP 96-97 (Duran Depo 83:23-84:5)]. Further, the transfer of Kukui Marketplace and others would have occurred whether or not Wilson was the asset manager of Kukui Marketplace, as Duran testified that "APFC would never decide to transfer an asset over the performance of a single asset manager" [*see* APP 94-95 (Duran Depo 79:25-80:16)].

24.     In late 2018, Gerdes announced his intention to retire [*see* APP 46-47 (Dinan Depo 56:25-57:4); *see also* APP 189 (Smith Depo 249:2-11); *see also* APP 136 (Plumlee Depo 161:3-21)]. Discussions about Gerdes imminent step-down and retirement began in early 2019 [*see* APP 47-48 (Dinan Depo 57:24-58:12); *see also* APP 136 (Plumlee Depo 161:3-15); *see also* APP 181 (Smith Depo 206:13-24)].

H.     **WILSON INFORMS L&B OF HIS CANCER DIAGNOSIS, AND HE TAKES FMLA LEAVE**

25.     In March 2019, Wilson was diagnosed with prostate cancer. In accordance with recommendations from his physician, on April 1, 2019, Wilson submitted an FMLA leave request to Holly Dinan to obtain surgery as part of his treatment plan [*see* APP 244; *see also* APP 73-74 (Dinan Depo 180:24-181:2)]. On April 8, 2019, Wilson's FMLA request was approved by L&B [*see* APP 224]. While in the process of requesting FMLA, Wilson had multiple conversations with Dinan about his diagnosis, leave, and surgery [*see* APP 429; *see also* APP 73-74 (Dinan Depo 180:24-181:2)]. Wilson provided his team with an update on the surgery on April 8, 2019, and confirmed that he was available remotely until he was able to return to the office [*see* APP 278; *see also* APP 429; *see also* APP 81 (Dinan Depo 210:3-16)].

26.     In advance of an upcoming Management Committee meeting scheduled for April 9, 2019, Dinan met with Smith and Plumlee and informed them that Wilson was on medical leave and that "any decisions to continue on letting Terry go would have to be on pause until he was clear to return to work after FMLA leave" [*see* APP 81 (Dinan Depo 210:17-23); *see also* APP 185-186 (Smith Depo 236:16-237:1 and 237:9-18)]. Despite Wilson's FMLA paperwork listing a clear end date, when Smith asked how long Wilson would be out on medical leave, Dinan responded that she did not know [*see* APP 244].

27.     At the April 9, 2019 Management Committee meeting, the minutes note that Dinan "reported on her on-going discussion regarding realignment of retail staffing" [*see* APP 255]. These minutes are the only Management Committee meeting minutes produced to date which even remotely evidences any discussion of changes to retail staffing. Smith could point to any other document evidencing any prior discussion, and in his deposition Plumlee could not recall any

specific discussion about Wilson's termination [*see* APP 193-196 (Smith Depo 258:17-259:5 and 262:23-263:6); *see also* APP 144 and 146 (Plumlee Depo 226:13-17 and 228:10-19)].[5]

I.   **L&B TERMINATES WILSON UNDER THE GUISE OF A "POSITION ELIMINATION," AND THEN COMPLETES SMITH'S "VISION" FOR THE "NEXT GEN"**

28.   Wilson was released by his physician to return to work on April 15, 2019, with minimal restrictions [*see* APP 223].

29.   At the June 2019 Management Committee meeting, the decision to ostensibly eliminate Wilson's position was finalized [*see* APP 277]. Accordingly on June 19, 2019, Wilson was informed of L&B's decision. The termination notice received by Wilson states that his duties will be "absorbed by the remaining Asset Managers" and Wilson was permitted to continue working until July 5, 2019 [*see* APP 277; *see also* APP 27-28 (Wilson Depo 118:25-119:20)].

30.   On July 8, 2019, Smith and Gerdes concluded a discussion about the need to hire yet another retail asset position [*see* APP 344]. It is evident that discussions about hiring an additional asset employee were held contemporaneously with L&B's decision to eliminate Wilson's position due to an alleged lack of work in the retail asset management department [*see* APP 343-344; *see also* APP 324].

31.   On July 5, 2019, Wilson departed L&B [*see* APP 11-12, Wilson Depo 45:25-46:2]. Three days later, on July 8, 2019, Aburrow, Ellis, and Formanek all received identical promotions to Senior Asset Manager [*see* APP 275 (Aburrow); *see also* APP 328 (Ellis); *see also* APP 276 (Formanek)]. Gerdes and Dinan worked on the announcements for Formanek, Ellis and Aburrow's promotions [*see* APP 51-52 (Dinan Depo 98:7-16, 99:21-25); see also APP 341-342]. L&B noted on the personnel action forms for each of them that they had been "promoted." [*see* APP 275, 328,

---

[5]   Remarkably, Plumlee's deposition on July 27, 2021, was merely a month after his June 25, 2021 declaration submitted in support of Defendant's Motion for Summary Judgment.

and 276] On the same day the three younger managers received their promotions, Smith noted that 'retail' was "shifting from a bad word to one of intrigue" [*see* APP 324]. At this time, the only shift to the department was the elimination of Wilson, and the subsequent promotion of the three younger, less-experienced, newly-appointed Senior Asset Managers.

32.     In 2018, L&B began discussing Gerdes' retirement [see APP 115 (Plumlee Depo 81:13-17); see also APP 166 (Smith Depo., 155:19-20)] and, thereafter, on July 23, 2019, pursuant to his Transition Agreement (a/k/a "step-down agreement"), Gerdes began his transition to retirement [*see* APP 305]. As a result of Gerdes' transition, Gerdes ceased direct management of retail assets and assumed a purely advisory and consulting role [*see* APP 305].

33.     In November, 2019, Aburrow met with Gerdes for his annual performance evaluation in which Gerdes notes that Aburrow is ready for a promotion to "VP of Retail Asset Management" – the same position formerly held by Wilson and allegedly *eliminated* by L&B [*see* APP 316].

34.     In late 2019, L&B hired Andrea Troskey to yet another position within the Retail Asset Management Department, as an Analyst [*see* APP 408]. At the time of her hire, Troskey lacked ARGUS training, and was sent by L&B to obtain such training, which is a 1-day or 3-day training session. [*see* APP 76 (Dinan Depo 183:6-16)]. Since that time, Troskey has left and was, again, replaced [*see* APP 106-107 (Plumlee Depo 31:17-32:8)].

35.     On January 1, 2019, Aburrow and Ellis received promotions to the  role of Director [*see* APP 321; *see also* APP 329]. Plumlee has confirmed that, aside from additional benefits, there is no difference between the position of a Senior Asset Manager and a Director [*see* APP 131 (Plumlee Depo 149:14-19)]. Plumlee went on to confirm that the positions of Director and Vice President, differ only in benefit offering, and both positions perform the same responsibilities [*see*

APP 132 (Plumlee Depo 150:6-16)]. Additionally, the mere transfer of duties upon a team member's departure does not automatically equate to a promotion or a pay increase – in this case, Aburrow and Ellis received both [*see* APP 211-212 (Corp Rep Depo 57:1-58:1); *see also* APP 321; *see also* APP 329]. As they had become the most highly ranked employees within the Retail Asset Management department, Aburrow and Ellis were responsible for all retail asset management and were required to prepare succession plans [*see* APP 108 and 117 (Plumlee Depo 36:12-20 and 89:10-14); *see also* APP 38 (Dinan Depo 31:22-25)].

36.    Aburrow and Ellis also received invitations to join L&B's revenue sharing program [*see* APP 356]. Wilson did not receive an invitation to join L&B's revenue sharing program until he obtained the title of "VP" [*see* APP 260; *see also* APP 433]. Testimony from Plumlee and Smith confirm that, under normal circumstances, invitations to join L&B's revenue sharing program are highly selective, given only to senior executives or employees with significant tenure (20+ years) at L&B [*see* APP 109-112 (Plumlee Depo 51:24-52:3, 52:23-53:8, 54:15-21); *see also* APP 182-183 (Smith Depo 231:24-232:11)]. In this case, however, Aburrow and Ellis were invited to join in March 2021, after only being with L&B for 3 and 7 years at the time, respectively, but only after their promotions following Wilson's termination [*see* APP 356; *see also* APP 313 (Aburrow hired 01/02/2018); *see also* APP 322 (Ellis hired 03/03/2014); *see also* APP 261-263 (Aburrow CV), 264 (Ellis CV), and 265 (Formanek CV)].

## III.  ARGUMENTS AND AUTHORITIES

### A.    ALL INFERENCES ARE TO BE DRAWN IN FAVOR OF THE NON-MOVANT, WITH FACTS CONSIDERED IN THE LIGHT MOST FAVORABLE TO HIM.

Summary judgment is not intended to permit a case to be tried on affidavits and thus deprive a litigant of a full trial on the merits, but only "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Courts should act "with caution

in granting summary judgment" and are encouraged to "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 217CV00123JRGRSP, 2018 WL 3375192, at *5 (E.D. Tex. July 11, 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The movant is only entitled to summary judgment if it has met its burden of establishing that there is no genuine issue of material fact. *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 640 (5th Cir. 1985); *Lindsey v. Prive Corp.*, 987 F.2d 324, 328 (5th Cir. 1993); *Acker v. Deboer, Inc.*, 429 F. Supp 2d 828, 837 (N.D. Tex. 2006); *see* FED. R. CIV. P. 56(a). In deciding whether there is a material fact issue precluding summary judgment, "the court must indulge every reasonable inference from [the underlying] facts in favor of the party opposing the motion." *Thornbrough* , 760 F.2d at 640 (internal citations omitted). A fact issue exists where "reasonable and fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions" in light of all the evidence presented. *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996); *see Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1508 (5th Cir. 1988).

In employment discrimination claims, the Fifth Circuit disfavors summary judgment because such claims involve "nebulous questions of motivation and intent." *Thornbrough*, 760 F.2d at 640 (citations omitted). Therefore, "if any facts are in dispute, summary judgment is generally inappropriate. *Id.* at 641 (citation omitted).

**B.    L&B'S CATERING TO THE "NEXT GEN" AND WILSON'S RETIREMENT TIMELINE NOT ALIGNING WITH ITS "VISION" PROVIDES DIRECT EVIDENCE THAT WOULD SUPPORT A JURY FINDING THAT WILSON'S AGE WAS A FACTOR IN HIS TERMINATION.**

Federal courts recognize two alternative methods for proving an age discrimination claim: (1) via direct evidence that proves discriminatory animus; and (2) since discriminatory animus is often covert, via circumstantial evidence through a burden-shifting analysis. *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 350 (5th Cir. 2005).

Defendants first attack the direct method of proof of age discrimination by claiming a lack of ageist comments, attempting to focus solely on one email from Smith. This ignores additional evidence showing animus toward Wilson's age. Critical evidence of age discrimination through supervisors' statements and actions cannot be ignored; to do so would fail to draw all reasonable inferences in favor of the non-movant. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000). The employer need not even make a direct statement referencing the employee's age to display discriminatory animus, but "[i]ndirect references to an employee's age can support an inference of age discrimination." *Hansard v. Pepsi–Cola Metro. Bottling Co.*, 865 F.2d 1461, 1466 (5th Cir. 1989). Mere comments such as "that an employee needed to look 'sharp' if he were going to seek a new job, and that he was unwilling and unable to 'adapt' to change" are examples of indirect age-related comments. *Machinchick*, 398 F.3d at 353 & n. 25 (quoting *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 315–16 (5th Cir. 2004)).

Here, direct evidence shows that Smith had discriminatory animus regarding Wilson's age. Defendants' argument regarding the email Smith sent to Wilson referencing the "next gen" at L&B ignores the conversation between Wilson and Smith when Wilson was asked directly how long he planned to work and the other evidence showing Smith's "vision" regarding the asset management department. When Wilson responded that he would like to work another five or six years, Smith replied, "That doesn't work for me" [*see* APP 22-23 (Wilson Depo 91:20-92:11); *see also* APP 168-169 (Smith Depo 160:18-161:2); *see also* APP 139-140 (Plumlee Dep. 220:24-221:6 (testifying that a Wilson's five to six year timeline "was outside of our -- what we felt was appropriate for the department. Way outside of it."))]. Taken in conjunction with Smith's professed desire about addressing questions from the "next gen" at L&B, and L&B's close monitoring of employees over 65 as posing a "risk" to L&B, there can be no question that the only reason L&B

was unsatisfied with Wilson's retirement timeline is because it did not match with Smith's "visions" for the "next gen" [*see* APP 139-140 (Plumlee Depo 220:10-221:6); *see also* APP 36-37 and 62-64 (Dinan Depo 21:24-22:4, 127:23-128:18, 129:2-11); *see also* APP 251].

Evidence of what occurred after Wilson's termination further bears out how Smith's vision of removing Wilson in favor of the "next gen" was accomplished. A mere three days after the conclusion of Wilson's employment, Ellis, Aburrow, and Formanek all received identical promotions to Senior Asset Manager [*see* APP 275 (Aburrow); *see also* APP 328 (Ellis); *see also* APP 276 (Formanek)]. At the same time, Gerdes began his "step-down," taking on a supervisory and counseling role [*see* APP 305]. In November 2019, Gerdes recommended Aburrow for the VP of Retail Asset Management position – the exact position recently "eliminated" by L&B [*see* APP 316 (emphasis added)]. On January 1, 2020, Aburrow and Ellis again received promotions, this time to the role of Director [*see* APP 321; *see also* APP 329]. Deposition testimony from L&B indicates that, aside from salary and vacation benefits, there is no difference between the job duties of a Director and a VP of Retail Asset Management [*see* APP 132 (Plumlee Depo 150:13-16)]. Finally, in connection with the their promotions to Director, Ellis and Aburrow received invitations to join the Revenue Sharing program [*see* APP 356]. Therefore, ample evidence exists showing that L&B's and Smith's preoccupation with its employees' ages and needing to cater to the "next gen" supports an inference that Wilson's retirement timeline was too far into the future for their liking and they, instead, terminated his employment to make room for the advancement of younger employees. Therefore, summary judgment on Wilson's claims of age discrimination under both the TCHRA and the ADEA should be denied.

## C.    CIRCUMSTANTIAL EVIDENCE ALSO ESTABLISHES AGE DISCRIMINATION.

Under the circumstantial method of proof, the employee makes a prima facie case by showing that he was "(1)... discharged; (2) he was qualified for the position; (3) he was within the

protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Paulissen v. Mei Techs., Inc.*, 942 F. Supp. 2d 658, 663 (S.D. Tex. 2013); *Machinchick*, 398 F.3d at 350. A presumption of discrimination occurs when the employee meets this minimal initial burden." *see Machinchick*., 398 F.3d at 350.  The employee is entitled to a "presumption of intentional discrimination" if he can meet the "minimal" initial burden of establishing a prima facie case. *Thornbrough*, 760 F.2d at 638–39 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981)). The precise elements for this showing vary depending on the allegations in each case, particularly for the fourth element, but the employee's burden is not onerous. *See Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012); *Thornbrough*, 760 F.2d at 638–39.

After the employee makes this prima facie showing, the employer must "demonstrate a legitimate nondiscriminatory purpose for the employment action." *Paulissen*, 942 F. Supp. 2d at 663 (citing *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010)). If the employer meets this burden, then the employee defeats summary judgment by showing that the stated purpose was mere pretext or that the stated purpose was only one reason for termination with discrimination being a motivating factor. *See Goudeau v. Nat'l Oilwell Varco LP*, 793 F.3d 470, 475 (5th Cir. 2015) (citation omitted) (construing TCHRA). Pretext may be established by showing that the employer's stated purpose is false or unworthy of credence. *Paulissen*, 942 F. Supp. 2d at 666 (citing *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010). The employer's stated purpose may be considered false and unworthy of credence, requiring the denial of summary judgment to the employer, where the employer states differing reasons for its action. *See id.* at 666-72 (differing reasons for termination plus age-related comments showing potential animus by

person involved in termination was sufficient to raise fact issue on pretext to defeat summary judgment).[6]

L&B only attacks the fourth element of Wilson's prima facie case in the circumstantial method of proof. Wilson can therefore present a prima facie showing of age discrimination by showing that he was replaced by a significantly younger employee, treated less favorably than younger employees, and/or discharged because of his age. Wilson can then defeat summary judgment through evidence that L&B's proffered legitimate non-discriminatory basis for terminating him is false or unworthy of credence or that it was a pretext for age discrimination.

### 1.      Substantial evidence supports that Wilson was replaced by a substantially younger employee.

There is substantial evidence from which reasonable jurors could conclude that Peter Aburrow in fact replaced Wilson, satisfying the fourth prong of his prima face case. Months prior to the February 11, 2019 Management Committee meeting – the alleged date that the decision was made to eliminate Wilson's position – Defendants were aware that Gerdes intended to retire from L&B [*see* APP 46-47 (Dinan Depo 56:25-57:4); *see also* APP 189 (Smith Depo 249:2-11); *see also* APP 136 (Plumlee Depo 161:3-21)]. This fact makes it clear that at the time the decision to eliminate Wilson's position was allegedly made, Defendants knew that the only other senior member of the Retail Asset Management department over the age of 40 would soon be departing L&B, leaving the department in the hands of three junior employees all under the age of 40. The handing over of the Retail Asset Management department to younger employees is further

---

[6]   *See also, e.g.*, *Harp v. Cooke Cty. Tex.*, No. 4:17-CV-748, 2018 WL 6617637, at *2 (E.D. Tex. Dec. 18, 2018) (mem. op.) (adopting magistrate's report and recommendation finding a genuine issue of material fact regarding pretext where the proffered reasons for discharge are inconsistent between deposition transcripts, interrogatory answers, and other records); *Jones v. R.G. Barry Corp.*, No. 16-cv-154 (RCL), 2017 WL 1049566, at *7-8 & n.9 (W.D. Tex. Mar. 17, 2017) (mem. op.) (employer's equivocal reasons for job elimination were sufficient to preclude summary judgment).

supported by the termination document given to Wilson on June 16, 2019, which specifically states that Wilson's duties were to be absorbed by "the remaining Asset Manager," not the remaining VP of Retail Asset Management [*see* APP 277].

A mere three days after Wilson's termination, Ellis, Aburrow, and Formanek – the three remaining, younger Asset Managers – all received identical promotions to Senior Asset Manager [*see* APP 375 (Aburrow); *see also* APP 328 (Ellis); *see also* APP 276 (Formanek)]. The purpose of these promotions was to "assure" L&B's clients that they were dealing with managers with "appropriate authority responsibility" [*see* APP 130 (Plumlee Depo 148:5-16); *see also* APP 222]. The same day that Ellis, Aburrow, and Formanek received their promotions to Senior Asset Manager, Defendant Smith remarked in an email that "'retail' [was] shifting from a bad word to one of intrigue" [*see* APP 325; *see also* APP 344]. As of July 8, 2019, retail had not acquired any new assets, and had recently lost three assets from its largest client, thus Smith could not have been referring to any change in the business prospects for the retail department. Shortly thereafter, Gerdes ceased direct management of retail assets and assumed a consulting, mentorship, and advisory role, pursuant to his "step-down" agreement [*see* APP 305]. It is therefore clear that 'retail' was a "bad word" when the department included Wilson, and became one of "intrigue" immediately upon the promotion of Ellis, Aburrow, and Formanek – all of whom were under 40 at the time of their promotions.

In November 2019, a few months after Wilson's termination, Gerdes indicated on Aburrow's performance evaluation that Aburrow was ready to assume the role of "VP of Retail Asset Management" [*see* APP 316]. This recommendation to promote Aburrow to the exact job title vacated by Wilson was made mere months after the alleged "elimination" of Wilson's position.

Finally, By January 1, 2020, only six months after Wilson's termination, Ellis and Aburrow received promotions to the role of "Director" [*see* APP 321; *see also* APP 329]. Testimony provided by L&B's Corporate Representative, Dan Plumlee, and Holly Dinan all support that, aside from salary and vacation benefits, there is no difference between the job duties of a Director and a VP of Retail Asset Management [*see* APP 131-132 (Plumlee Depo 149:14-19, 150:6-16)]. Therefore, the evidence indicates that Plaintiff was replaced by Peter Aburrow.

### 2.    Substantial evidence supports that Wilson was otherwise discharged because of his age.

Wilson can also satisfy the fourth prong of the McDonnell Douglas burden-shifting test because the evidence supports that Wilson was "otherwise discharged because of his age." *Palasota v. Haggar Clothing Co.*, No. 3:00-CV-1925-G, 2001 U.S. Dist. LEXIS 15161, at *9-12 & nn.2-3 (N.D. Tex. Sept. 25, 2001) (Fish, J.). In *Palasota*, this Court found that the plaintiff raised a genuine issue of material fact when the evidence demonstrated that the employer had "an ongoing and developing plan to transfer the responsibilities" of older employees to younger employees, whose positions differed only in title and salary. *See id.* at *10-11.

The facts of *Palasota* are nearly identical to those present in Wilson.  First, Defendants' novice, untrained HR Director Holly Dinan, by her own admission, "targeted" employees approaching 65 years of age for succession planning [*see* APP 62-63 (Dinan Depo 127:20-128:18)]. Dinan then discussed the relative workforce age at management committee meetings with regard to succession planning [*see* APP 36-37, 39 and 62-64 (Dinan Depo 21:24-22:4, 32:18-23, 127:20-128:18, 129:2-11)]. Likewise, Defendant Smith repeatedly discussed the interests of the "next gen" in connection with succession planning [*see* APP 427]. Defendants were aware that Gerdes, the only other employee over 40 in the Retail Asset Management Department, was stepping down prior to making the decision to eliminate Wilson's position, thus Defendants were

presented with an opportunity to transition the Retail Asset Management department to younger employees [*see* APP 46-47 (Dinan Depo 56:25-57:4); *see also* APP 189 (Smith Depo 249:2-11); *see also* APP 115 and 136 (Plumlee Depo 81:9-17, 161:3-21)]. After the elimination of Wilson and Gerdes' step-down, all retail assets were managed by Aburrow and Ellis, who were then given job titles that had no substantive difference in responsibilities from Wilson's [*see* APP 117 and 132 (Plumlee Depo 89:10-21, 150:6-16)].  This fully matches with L&B not being satisfied with Wilson's retirement plan being too far in the future, as it did not cater to the "next gen" and L&B's "vision" for it, as previously discussed.  Therefore, Wilson can also satisfy the fourth prong of his prima facie case by showing that he was otherwise discharged because of his age, and summary judgment should be denied.

### 3. Defendants' proffered reason for terminating Wilson is false and merely a pretext for age discrimination.

Defendants proffer an alleged decline in retail assets as the sole reason for Wilson's discharge from L&B as leading to an alleged "elimination" of his position.  However, the evidence calls into question severity of this alleged decline, as well as the alleged "necessity" of eliminating Wilson's position – and there is even a genuine dispute as to whether his position was eliminated at all. In addition, the mere fact that Defendants have, over time, proffered numerous – and contradictory – bases for terminating Wilson establishes that such bases are false or unworthy of credence, and instead are mere pretext to obscure discrimination *See Paulissen*, 942 F. Supp. 2d at 666-72 (fact issues on pretext precluded summary judgment to employer due to differing reasons for termination).[7]

---

[7]   *See also, e.g., Harp*, 2018 WL 6617637, at *2 (adopting magistrate's report and recommendation finding a genuine issue of material fact regarding pretext where the proffered reasons for discharge are inconsistent between deposition transcripts, interrogatory answers, and other records); *Jones.*, 2017 WL 1049566, at *7-8 & n.9 (employer's equivocal reasons for job elimination were sufficient to preclude summary judgment).

> ### a. Genuine issues of fact exist on whether Wilson's position was eliminated – and on whether there was any real need to eliminate it.

Defendants allege that a decline in the number of L&B's retail assets necessitated the elimination of Wilson's position [*see Defendants' Appendix in Support of Motion for Summary Judgment*, Doc. No. 36, APP 138 ¶ 23]. This alleged decline began in 2015 and continued through the date of Wilson's termination in July 2019 [*see* APP 120-121 (Plumlee Depo 106:8-107:12)]. Defendants contend that this alleged decline resulted in a lack of work for Wilson, thus "necessitating" the elimination of one of the allegedly "redundant" VP positions in the retail asset management department [*see* APP 347].

However, deposition testimony indicates that months prior to Defendants' alleged discussions of eliminating Wilson's position, Defendants were well aware that John Gerdes, the Executive VP of Retail Asset Management and Wilson's direct supervisor, was planning his imminent retirement and had been discussing it with Smith and Plumlee since 2018 [*see* APP 46-47 (Dinan Depo 56:25-57:4); *see also* APP 166, 181 and 189 (Smith Depo 155:19-20, 206:13-24, 249:2-11); *see also* APP 115 and 136 (Plumlee Depo 81:9-17 and 161:3-21); *see also* APP 210 (Corp Rep Depo 46:6-16)]. In July 2019, the same month of Wilson's departure, as part of Gerdes' "step-down" agreement, he ceased direct management of retail assets, taking on a consulting, mentorship, and supervisory role [*see* APP 305]. Evidence also shows that, as part of Gerdes' succession plan, Wilson would be his logical successor [*see* APP 358]. The fact that Defendants were aware that Gerdes would soon begin transitioning to retirement calls into question the alleged "need" to eliminate Wilson's allegedly "redundant" position, as such "redundancy" was soon to be remedied by having Wilson assume Gerdes' role.  Instead, Wilson was also terminated, who notably was also nearing 65 and was having major health issues, but who was far from ready for retirement.  The end result is that the younger employees within the retail asset department

ultimately assumed job titles with responsibilities equivalent to Wilson, thus even calling into question that his position was truly eliminated at all, and they (Aburrow and Ellis) took over all retail asset management duties for all of the assets in the retail management group [*see* APP 117 (Plumlee Depo 89:10-21)].

Also contradicting L&B's alleged decline and lack of work, the company continued to hire employees for positions in the Retail Asset Management department. For example, L&B hired Michael Formanek in 2017, followed shortly thereafter by hiring Peter Aburrow in 2018 [*see* APP 309; *see also* APP 313]. Around the time of Wilson's termination, Gerdes and Smith discussed hiring yet another retail asset employee to work in its allegedly overstaffed Retail Asset Management department [*see* APP 344]. Further, by the end of 2019, less than six months after Wilson's departure, Defendants hired Andrea Troskey for a position in the retail asset management department [*see* APP 49-50 (Dinan Depo 77:15-78:5)]. It should be left to a jury to decide why Defendants continued to hire new, young talent, and discussed the hiring of even more new staff for jobs within Retail Asset Management department when there was allegedly insufficient work to support Wilson's position.

Further contradicting Defendants' claims of a "lack of work," is the notable difference between the assets managed by Wilson and Gerdes. After the sale and transfer of certain assets prior to Wilson's termination in June 2019, Gerdes managed eight assets, while Wilson managed

seven [*see* APP 398].[8] Defendants' contentions that Gerdes' assets were more "labor intensive" are contradicted by deposition testimony from Plumlee. Plumlee acknowledged that many of Gerdes assets employed an outside, third-party operating partner – Macerich – which handled much of the day-to-day duties of a retail asset manager [*see* APP 206-209 (Corp Rep Depo 40:22-43:20); *see also* APP 118 (Plumlee Depo 104:13-22)]. None of Wilson's retail assets had the assistance provided by Macerich, thus all of the management duties on Wilson's assets were performed by Wilson, independently.

Finally, deposition testimony shows that Defendants' decision to eliminate Wilson's position was not only unprecedented, but marked a distinctive departure from Defendants' past practices during an economic downturn – and yet not a single contemporaneous document even mentions that L&B was planning on eliminating Wilson's position as early as February 2019. Since Plumlee and Defendant Smith took over L&B in 2005, L&B has never had a layoff [*see* APP 113 (Plumlee Depo 58:10-19)]. Plumlee could not name a single instance since 2005 where L&B made a business decision to eliminate any position other than Wilson's [*see* APP 114 (Plumlee Depo 59:8-12)]. In addition, Plumlee discussed that during a prior downturn affecting the acquisitions department, acquisitions personnel were not eliminated, but instead reassigned to assist other departments until there was enough work for them to resume their usual duties [*see* APP 137-138 (Plumlee Depo 197:21-198:2)]. No options to termination for Wilson were

---

[8]    Plumlee's Declaration attached to the Motion for Summary Judgment provides misleading information regarding these sales and transfers.  The documentation, at APP 398, shows that, of the assets shown as not being sold or transitioned, plus those shown as sold or transitioned in November 2019 or beyond, several months after Wilson's termination, there were eight assets being managed by Gerdes and seven by Wilson.  Plumlee's Declaration, however, attempts to include the Glades Plaze and Belleview Plaza assets as being "Wilson's" despite the sale of these assets occurring in November 2019, five months later. *Compare id.*, with Defs' MSJ Appendix, Plumlee Decl., at APP 137 ¶¶ 15-16. Similarly, the three APFC properties shown at APP 398 and discussed at paragraph 14 of Plumlee's Declaration (Defs' MSJ Appendix, at APP 137) – the Kukui Marketplace, Maui Marketplace, and Kukui Grove Center – were being managed by Gerdes and Formanek at the time they were transferred or sold yet they were not disciplined or fired [*see* APP 367; *see also* APP 421].

considered by Defendants or presented as an option to Wilson -- not consulting with the Company, taking a pay cut, taking the job of asset manager, senior asset manager or director, suggesting Wilson retire in a shorter time period anywhere from one year to four years, or even considering Wilson's skill sets in departments other than retail management [*see* APP 179 and 189-192 (Smith Depo 193:15-25, 249:18-250:5, 251:21-24, 255:1-8); *see also* APP 133 and 135 (Plumlee Depo 158:7-17, 160:7-13)] . Thus, it appears that, despite other departments suffering downturns over the years, Wilson was the only L&B employee for whom elimination was the ***only*** option considered [*Id.*; *see* APP 210 (Corp Rep Depo 46:14-16)].

Furthermore, a fact issue exists as to whether the purported decision to eliminate Wilson's position occurred at the February 2019 management committee meeting as discussed in detail, *infra*, at Section III(C)(3)(a)(c). Despite the elimination of Wilson's position being unprecedented and allegedly discussed at multiple executive management meetings, there are no notes or emails that even mention any discussion of any staffing changes prior to April, 2019, and Smith could only point an ambiguous-at-best reference in the February 2019 executive committee meeting minutes as somehow encompassing this discussion [*see* APP 186-187 (Smith Depo 237:19-238:1)]. However, the minutes specifically refence this as an "Action item" to "continue on-going discussions" regarding *succession* within the department, not that any decision on eliminating a position, let alone specifically Wilson's, was being made [*see* APP 253]. By contrast, the April 2019 Management committee minutes, which again do not specifically mention a discussion of the elimination of Wilson's position, does specifically states that Holly Dinan, "reported on her on-going discussion regarding *realignment* of retail staffing" [*see* APP 255 (emphasis added)]. These notes suggest that the first discussion of changes to retail staffing occurred during the April 9, 2019 Management Committee meeting, not the February 11, 2019 meeting. And, notably,

Plumlee could not even remember having the discussions to terminate Wilson in those meetings [*see* APP 144-147 (Plumlee Depo 226:13-17, 227:10-18, 228:10-229:4)].[9] Together with the prior evidence of Wilson ultimately being replaced, a jury should therefore determine whether there was even any true need to eliminate Wilson's position – or indeed whether any elimination took place – versus whether Wilson's age was the true reason for his termination, thus rendering summary judgment inappropriate.[10]

> ### b. Equivocal and false reasons for terminating Wilson establishes pretext.

The provision of different reasons at different times supports a finding that the reason ultimately settled on by the employer is fabricated. *See, e.g., Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441 (1st Cir. 2009).[11]  Defendants' ever-changing reasons for terminating Wilson that have since been proven false therefore establishes pretext.  Defendants' sole remaining basis should be considered false or unworthy of credence where there is clearly contradicting evidence and where L&B has previously made false statements to the Texas Workforce Commission about its reasons for terminating Wilson, including:

- L&B lost "capable Retail Asset Managers because of Wilson's management style" [*see* APP 346], ***when in fact*** no departing retail asset manager or analyst said he or she was leaving because of Wilson or his management style, no disciplinary or performance records reflect this claim, and Wilson had even been selected as a mentor for L&B's mentorship program [*see* APP 60-61 and 79 (Dinan Depo 125:8-126:10, 197:14-24); *see also* APP 266; see also APP 270];

---

[9]   Plumlee's sudden lack of recall, by itself, raises a fact issue considering his deposition testimony contradicts his own declaration submitted with the Motion for Summary Judgment merely a month before his deposition.

[10]   Similarly, a jury should be allowed to decide whether Defendant's disability, FMLA leave, or use of ERISA benefits were also reasons for his termination.

[11]   *See also Harp*, 2018 WL 6617637, at *2 (adopting magistrate's report and recommendation finding a genuine issue of material fact regarding pretext where the proffered reasons for discharge are inconsistent between deposition transcripts, interrogatory answers, and other records); *Jones*, 2017 WL 1049566, at *7-8 & n.9 (finding employer's equivocal reasons for job elimination were sufficient to preclude summary judgment against employee); *Paulissen*, 942 F. Supp. 2d at 666-72 (fact issues on pretext precluded summary judgment to employer due to differing reasons for termination).

- "Wilson had become so difficult to work with, the client [APFC] requested that the Firm remove Wilson from having any oversight responsibilities on its assets" [*see* APP 347], *when in fact* Wilson's contact at APFC testified that she has "never requested the removal of a specific asset manager," and that APFC, "would never transfer assets from one advisor to another over the performance of a single asset manager" [*see* APP 94-97 (Duran Depo 79:25-80:16, 83:23-84:5)];[12]

- L&B's "retail assets were projected to decrease by almost half in 2019" [*see* APP 347], *when in fact* Plumlee testified that no such forecasting was done at L&B and that no one at L&B keeps up with the percentage of decline in retail assets under management [*see* APP 122 and 124-126 (Plumlee Depo 115:8-12, 122:19-23, 124:20-125:1)];

- L&B's statements that it had "too much horsepower with Gerdes and Wilson in the Vice President positions" [*see* APP 347], *when in fact*:

  o   Gerdes was the only manager of the department and was negotiating a retirement "step down" plan at the time of Wilson's termination [*see* APP 46-47 (Dinan Depo 56:25-57:4); *see also* APP 166, 206 and 189 (Smith Depo 155:19-20, 206:13-24, 249:2-11); *see also* APP 115 and 136 (Plumlee Depo 81:9-17 and 161:3-21); *see also* APP 210 (Corp Rep Depo 46:6-16)];

  o   according to L&B, there is no difference in the job duties between Wilson and Aburrow, Formanek, and Ellis apart from Wilson not being trained in ARGUS that would require as little as one day to complete [*see* APP 131-132 (Plumlee Depo 149:14-19, 150:6-16)]; and

  o   Aburrow had been hired in 2018 during the purported significant decrease in retail asset management [*see* APP 313];

- In October of 2018, Smith met with Wilson to discuss Wilson's succession plan [*see* APP 427], *more than a year after* Wilson had been asked for and had cooperatively submitted his succession plan in May 2017 [*see* APP 353-355]. At no time prior to, or after that meeting in October 2018 had Wilson ever been asked for a new plan or for an update. Further, the October 2018 conversation between Smith and Wilson was a direct question regarding how many more years Wilson wanted to work before retiring – not a question of succession planning [*see* APP 168 (Smith Depo 160:21-23)]. Notably, none of the significantly younger employees – Aburrow, Ellis, or Formanek – were ever approached or presented with such an inquiry [*see* APP 164 and 168 (Smith Depo 148:9-15, 160:21-2); *see also* APP 127 (Plumlee Depo 138:16-24); *see also* APP 47-48 (Dinan Depo 57:24-58:3)];

---

[12]   Notably, Wilson continued to manage other APFC retail properties [*see* APP 397; *see also* APP 92 and 98 (Duran Depo 34:7-11, 159:11-21); *see also* APP 17 (Wilson Depo 63:7-14)], and Defendants did not penalize Gerdes or the younger Formanek, the asset managers assigned to an APFC asset after Wilson, when APFC removed that asset to a competitor [*see* APP 176-178 (Smith Depo 187:22-189:6)].

- "Smith notified Wilson that the Firm would likely not have enough work for him to remain in a full-time position for that amount of time because the Firm's retail assets were significantly shrinking" [*see* APP 348], *when in fact* no such "notification" was given, Smith said only that Wilson's desire to work five to six more years before retiring "would not work," Smith did not answer Wilson's question of how many more years would work for the company, and did not ever get back to Wilson because "it wasn't my [Smith's] job" [*see* APP 168-169 and 180 (Smith Depo 160:18-161:2, 205:3-11); *see also* APP 22-23 (Wilson Depo 91:20-92:18)];

- L&B's statement that "over the next few months, Smith continued to try and work with Wilson on his [succession] plan, but Wilson avoided working cooperatively with Smith to come up with a mutually agreeable plan" [*see* APP 347], *when in fact* Smith did not engage Wilson in person, by email, or by phone call after stating that working five to six more years "would not work" nor answered Wilson's question of what would "work" because "it wasn't my [Smith's] job" [*see* APP 169-170 (Smith Depo 161:10-162:2)].

Based on these previously asserted, and now abandoned, false reasons for terminating Wilson, any additional reasons proffered by Defendants should be considered false and unworthy of credence.

In Defendant's attempt to reach for any foothold to justify their illegal actions, in the Motion for Summary Judgment, they hang on to only the nebulous claim of needing to eliminate Wilson and their conclusory mantra that there is "nothing pretextual" about retaining the three younger, non-disabled co-workers based on their lower level of pay and their training in ARGUS software. *See* Defendants' MSJ Brief, Doc. No. 35, at 16. In their position statement to the TWC, however, Defendants attempt to equate Wilson instead with his supervisor, Gerdes, claiming the company did not need both highly paid individuals. As previously discussed, however, Defendants already knew, at the time they were allegedly discussing eliminating the "redundant" Wilson, that Gerdes was working toward stepping down his role and retiring.

Defendants' argument about Wilson not having the same ARGUS training as his younger counterparts also shrivels in the light of day. Using ARGUS was more of the lower-level "grunt work" that analysts did – not Asset Managers like Aburrow and Ellis, the younger employees who eventually were given virtually identical jobs as Wilson [*see* APP 72 (Dinan Depo 166:7-15)].

Also, training for ARGUS takes only one to three days, and L&B regularly sent employees to train [*see* APP 75-76 (Dinan Depo 182:24-183:16); *see also* APP 174-175 (Smith Depo 170:21-171:4)]. Therefore, L&B could just as easily have sent Wilson if that was indeed the primary deficiency in his talents that necessitated his termination.

The foregoing cited evidence establishes that, at every step of the way, Defendants have provided varying, contradicted, and ultimately false reasons for terminating Wilson, which would allow a jury to decide that its latest reasons are false and unworthy of credence, and instead pretext for age discrimination or other illegal reasons, such that summary judgment should be denied.

### c. *The same-actor inference does not conclusively rebut a prima facie case, and should not apply where inferences are to be drawn in the non-movant's favor.*

In a bid to escape having a jury determine the outcome of this case, L&B vastly overstates the effect of the "same-actor" inference. The same-actor inference is just that – *an inference* – and the Fifth Circuit specifically declined to give it a preclusive effect, permitting evidence to be presented to defeat the inference. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) ("By expressing our approval of this inference, we do not rule out the possibility that an individual could prove a case of discrimination in a similar situation."), *abrogated on other grounds by Reeves*, 530 U.S. at 134; *see also Jones*, 2017 WL 1049566, at *9 (quoting *Brown*). The same-actor inference is merely relevant, not preclusive, as the Court prefers "to look at the evidence as a whole, keeping in mind the ultimate issue: Whether age was a determinative factor in the employment decision." *Huan v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996). In the summary judgment context, the same-actor inference functions similarly to the employer's proffered nondiscriminatory basis and is similarly rebutted by the employee raising a genuine issue of material fact regarding pretext. *Harp*, 2018 WL 6617637, at *2 (citations omitted). One court has even held that, in situations where inferences are to be drawn in favor of the nonmovant, such

as here, the same-actor inference has no application. *See Jones*, 2017 WL 1049566, at *9 & n.10 (declining to apply same-actor inference on employer's summary judgment motion).[13] By presenting a material fact issue with respect to pretext as discussed above, the same-actor inference in this case has been rebutted, and summary judgment should be denied.

### D.   WILSON'S DISABILITY DISCRIMINATION CLAIM SHOULD BE TRIED TO A JURY.

L&B correctly points out that the same burden-shifting analysis used in TCHRA age discrimination claims is also used in TCHRA disability discrimination claims, but the correct elements of the plaintiff's prima facie case are: (1) the plaintiff is disabled or regarded as disabled; (2) he was qualified for the job; (3) he was subjected to an adverse employment action on account of his disabilities; and (4) that he was replaced by or treated less favorably than non-disabled employees. *Schutze v. Fin. Computer Software*, No. 3:04-CV-0276-H, 2006 U.S. Dist. LEXIS 73734, at *10-11, 2006 WL 2842008, at *11 (N.D. Tex. Sept. 29, 2006) (citation omitted). L&B, however, essentially conflates the third element with the fourth; Wilson proving that he was terminated "because of his disability" would render the prima facie case's fourth element, and the remainder of the burden-shifting analysis, entirely superfluous. *See Scott v. BP Amoco Chem. Co.*, No. V-06-79, 2008 U.S. Dist. LEXIS 23594, at *25 & n.69 (S.D. Tex. Mar. 25, 2008). The third element of Wilson's prima facie case is more properly considered as simply being that he suffered an adverse employment action. L&B does not contest that Wilson suffered an adverse employment action, nor the first two elements of his prima facie case. L&B only contests that Wilson was

---

[13] The same-actor cases relied upon by Defendants are inapposite. In *Lockett v. Wal-Mart Stores, Inc.*, the same-actor inference was discussed in *dicta*, as the court has already determined that the employee's prior insubordination was sufficient to justify his termination. 337 F. Supp. 2d 887, 899-900 (E.D. Tex. 2004). The same is true of *Coblentz v. Glickman*, No. 98-3645, 1999 U.S. Dist. LEXIS 15851, 1999 WL 816266 (E.D. La. Oct. 13, 1999). Also, in *Lawson v. Graphic Packaging International, Inc.*, the court considered the same-actor inference as part of the jury instructions – not at summary judgment where inferences are to be drawn in favor of the non-movant. *See* 549 Fed. App'x 253, 258-59 (5th Cir. 2013).

replaced by or treated less favorably than non-disabled employees or otherwise terminated on account of his disability.

Regardless of whether the "on account of his disability" portion of the third element is truly part of the third or fourth element of the prima facie case or part of the pretext stage, Wilson can present sufficient evidence to establish his prima facie case.  Additionally, Wilson can establish that Defendants' proffered basis for his termination is false and unworthy of credence and is mere pretext for terminating him on the basis of his disability.  Therefore, summary judgment should also be denied as to his disability discrimination claim.

1. **Substantial evidence exists that Wilson was replaced by and treated less favorably than non-disabled employees.**

As previously established in the age discrimination context, Wilson was ultimately replaced by Aburrow, a non-disabled employee, who was in fact recommended to take over the job title left "vacant" by Wilson's termination but ultimately given a  job title that had job responsibilities identical to Wilson's title.  *See* discussion, *supra*, at Section III(C)(3)(b). Also, if the main reason for L&B's preference for its younger, non-disabled Asset Managers over Wilson was a lack of ARGUS training, that would have been easily remedied with as little as one day of training.  *See* discussion, *supra*, at Section III(C)(3)(b).

In addition to the above, Defendants displayed substantial favoritism towards Aburrow and Formanek – younger, non-disabled employees. From 2017-2019, Aburrow, Ellis, and Wilson all reported to Gerdes [*see* APP 318; *see also* APP 337, 330, 334; *see also* APP 272, 279, 282, 266]. Based on Formanek's performance evaluations, he officially reported Crown beginning in 2018, although Wilson also supervised him [*see* APP 310; *see also* APP 282]. Aburrow, Ellis and Wilson all reported to Gerdes [*see* APP 318; *see also* APP 337, 330, 334; *see also* APP 310], a fact issue

exists as to whether Aburrow and Ellis were similarly situated to Wilson at the time his position was eliminated.

Despite being the newest hire to the Retail Asset Management department with the least experience, Aburrow was not considered as a candidate for termination during the alleged downturn in retail assets [*see* APP 313; *see also* APP 210 (Corp Rep Depo 46:14-16)].

Similarly, Formanek was also given more favorable treatment. Formanek and Wilson co-managed the same retail assets [*see* APP 398]. After Wilson was removed from the Kukui Marketplace account, Formanek was given primary control over that asset, with Gerdes serving in an advisory capacity [*see* APP 286]. Formanek managed the Kukui Marketplace from September 2018 until the asset was transferred by APFC to a competitor in early 2019 [*see* APP 367; *see also* APP 421). Yet, after APFC decided to move the Kukui Marketplace and two other assets to a competitor, Formanek was not considered as a candidate for termination, despite being the last person in charge of those assets [*see* APP 210 (Corp Rep Depo 46:14-16)]. Further, Formanek was offered a transfer to the Portfolio Management department, where he continues to manage the same retail assets in a portfolio capacity that he managed while working in the retail asset management department [*see* APP 307-308]. Wilson, who had managed the assets currently assigned to Formanek before his termination, and who had relevant experience from his employment with LaSalle, was never presented with the option to transfer to a portfolio management role [*see* APP 398; *see also* APP 213-214 (Corp Rep Depo 71:12-21, 81:1-11)]. In their depositions, Plumlee and Smith both indicated that they had no doubts that Formanek, a significantly less experienced asset manager than Wilson, would be able to perform the function of a portfolio manager without significant additional training or difficulty [*see* APP 214 (Corp Rep Depo 81:6-11)]. It therefore stands to reason that Wilson, who had considerably more experience – both in general and with

respect to the assets presently managed by Formanek – would also have been able to perform the role of portfolio manager without significant additional training or difficulty. No candidates were considered for elimination other than Wilson [*see* APP 210 (Corp Rep Depo 46:14-16)].

Defendants assertion that Gerdes is the true comparator to Wilson will not prevail. Documentary evidence and deposition testimony from Smith, Dinan, and Plumlee all corroborate the fact that Gerdes was Wilson's supervisor [*see* APP 285; *see also* APP 279; *see also* APP 15 (Wilson Depo 59:19-22)]. In addition, deposition testimony from Smith, Dinan, and Plumlee all indicate that Gerdes entered into retirement discussions several months before the decision to eliminate Wilson's position began [*see* APP 47-48 (Dinan Depo 57:24-58:12); *see also* APP 136 (Plumlee Depo 161:3-15); *see also* APP 181 (Smith Depo 206:13-24)]. Any passing similarity between Gerdes and Wilson's positions, therefore, ended when the discussions about Gerdes retirement and "step-down" began, as Defendants had noticed that Gerdes was soon to transition into a purely supervisory, consulting role [*see* APP 305]. Thus, Defendants were never faced with a decision between keeping Gerdes or Wilson, but rather, they decided between keeping Wilson or any of Ellis, Aburrow, and Formanek – all three of whom were younger, non-disabled employees.

These facts  demonstrate that Wilson was treated less favorably than his younger, non-disabled colleagues, precluding summary judgment on Wilson's prima facie case of disability discrimination, rending summary judgment inappropriate.

### 2. Genuine issues of material fact exist regarding the timing of the decision to eliminate Wilson's position.

L&B also assails Wilson's prima facie case by claiming that none of the decision-makers had any knowledge of his cancer in February 2019, when they allegedly made the decision to terminate his employment.  However, there is, by itself, a fact issue as to whether the decision to

terminate Wilson's employment was made at that time. The minutes of the February 2019 Management Committee meeting are completely silent on the issue of eliminating Wilson's position – they speak only to an "Action item" to "continue on-going discussions" regarding succession within the department [*see* APP 253]. Defendant Smith testified that, aside from the minutes of that meeting, there is no document to evidence that the decision to eliminate Wilson's position was made in February [*see* APP 186-187 (Smith Depo 237:19-238:1)]. Likewise, Plumlee cannot recall any discussion occurring in any management committee meeting, including the alleged discussion surrounding the decision to eliminate Wilson's position [*see* APP 144-147 (Plumlee Depo 226:13-17, 227:10-18, 228:10-229:4)]. The only document that even mentions retail staffing are the April 9, 2019 Management Committee meeting minutes, wherein it states that the novice, untrained HR Director, Holly Dinan, was to "report" on the "realignment of retail staffing" [*see* APP 255]. This document suggests that the first Management Committee discussion regarding changes to staffing in the Retail Asset Management department occurred after the approval of Wilson's request for FMLA leave [*see* APP 224].

In addition, conflicting testimony from Smith and Plumlee likewise indicates that the decision to eliminate Wilson's position was not made in February 2019, but sometime after Wilson's FMLA leave in the late spring of 2019. During his deposition, Smith testified that, in a close-door meeting, Dinan advised him of Wilson's medical leave because "she needed to delay an action" [*see* APP 187 (Smith Depo 238:4-18)]. The action requiring delay was, purportedly, the elimination of Wilson's position [*see* APP 186 (Smith Depo 237:9-18)]. Dinan, too, confirmed that she informed Plumlee of Wilson's FMLA status in advance of the April 9, 2019 Management Committee meeting to request the delay of discussions surrounding the elimination of Wilson's position [*see* APP 81-82 (Dinan Depo 210:17-211:3)]. Dinan confirmed that these closed-door

meetings occurred in advance of the April 9, 2019 Management Committee meeting [*see* APP 81 (Dinan Depo 210:17-23)]. Dinan knew that Wilson's medical leave was for major surgery to remove his prostate cancer [*see* APP 67-68 and 80 (Dinan Depo 138:24-139:8, 204:7-23)]. A fact question therefore exists as to what details were divulged about Wilson's medical leave and if any reference to cancer was made during that meeting. Dinan also testified that she had regular meetings with Plumlee about the reports of the company's high-cost medical insurance claimants, and that at times she provided these reports to the Management Committee [*see* APP 56-58 (Dinan Depo 114:9-116:9)].

Taken together, these facts demonstrate that fact issues exist that preclude summary judgment on Wilson's prima facie case of disability discrimination, rending summary judgment inappropriate.

### 3.    L&B's proffered reason for terminating Wilson is false and merely a pretext for disability discrimination.

Summary judgment should also be denied as to L&B's proffered basis for terminating Wilson and because sufficient evidence of pretext exists.  For the same reasons discussed, *supra*, at Section III(C)(3)(b), regarding the many false reasons for termination Defendants report to the TWC, Defendants have presented ever-shifting reasons for terminating Wilson and the evidence has thoroughly established that each now-abandoned reason was false, thus making their currently proffered basis unworthy of credence.  Also as previously discussed, genuine issues of fact exist as to (1) whether Wilson's position was even eliminated rather than being filled by Aburrow but hidden with a different job title; (2) whether L&B needed to eliminate Wilson based on a redundancy between him and Gerdes that was being resolved by Gerdes' planned retirement; (3) why there was a need to eliminate any position when L&B was otherwise hiring new, younger employees into the Retail Asset Management department during the same period of downturn

allegedly necessitating his elimination; and (4) why L&B could not have had Wilson trained on ARGUS if that was truly the only deficiency that required him to be terminated in favor of the ARGUS-trained, younger, non-disabled employees in his department. Therefore, substantial evidence of pretext exists and summary judgment should be denied as to Wilson's disability claims.

### E.   WILSON'S FMLA RETALIATION CLAIM SHOULD BE TRIED TO A JURY.

The FMLA prohibits an employer from "retaliating against an employee…for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220; *see also* 29 U.S.C. § 2615(a)(2). To establish a prima facie case of FMLA discrimination or retaliation, a plaintiff must demonstrate that (1) he was protected under the FMLA; (2) he suffered an adverse employment decision; and (3) he was treated less favorably than an employee who had not requested leave under the FMLA *or* the adverse decision was made because of his leave request. *See Morris v. Tex. HHS Comm'n*, 2019 U.S. Dist. LEXIS 133737, at *35 (S.D. Tex. Aug. 8, 2019) (citing *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001)); *Villalon v. Del Mar Coll. Dist.*, No. C-09-252, 2010 U.S. Dist. LEXIS 82766, at *7 (S.D. Tex. 2010).

Under the mixed-motive analysis that the Fifth Circuit applies to FMLA retaliation claims, however, the plaintiff need only present evidence that the FMLA leave was a motivating factor in the termination. *See Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 2013) (citing *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005)). If this burden is carried, the employer must then come forward with sufficient evidence that it would have terminated the employee regardless of the illegal motivation. *Id.* Unlike the employer's burden to merely articulate an legitimate, non-discriminatory basis to rebut the plaintiff's prima facie case, the employer's burden in the mixed-motive analysis, upon a showing of a retaliatory motivating factor, is "effectively that of proving an affirmative defense." *Id.* (quoting *Richardson*, 434 F.3d at 333)

(internal quotations omitted).  However, since Defendants have not sought summary judgment under on the issue of terminating Wilson despite any motivating factor, Wilson need only present a prima facie case of retaliation and show that his FMLA leave was otherwise at least a motivation for his termination.

### 1.    Wilson can establish a prima facie case of FMLA retaliation.

Defendants only attack element three of Wilson's prima facie case, arguing that there were no similarly situated employees who did not request FMLA leave treated more favorably than Wilson and that, again, allegedly Defendants decided to terminate Wilson prior to his request for FMLA leave.[14]  Genuine issues of material fact exist, however, that render summary judgment inappropriate as to Wilson's prima facie case.

First, as to the timing of Wilson's leave and the claim that Defendants decided to terminate him beforehand, the evidence already discussed above demonstrates that significant issues of fact exist due to the contradictory evidence surrounding when Defendants allegedly formed their decision.  *See, supra*, at Section III(D)(1). Furthermore, if the decision to eliminate Wilson's position had already occurred, there should have been no reason for Dinan to request Smith to delay the conversation about the position elimination while Wilson was on FMLA leave [*see* APP 81 (Dinan Depo 210:17-23)][15]  Thus, Defendants would not have committed any FMLA violation merely by discussing the elimination of Wilson's position while he was on FMLA leave, especially if it had truly already been previously decided.  The only remaining inference that can be drawn is that the supposed decision to eliminate Wilson's position was not, in fact, made in February, as

---

[14]    In the Motion for Summary Judgment, Defendant Smith does not attack Plaintiff's allegation that he is an "employer" along with L&B under the FMLA.

[15]    *See Parker v. Hahnemann Univ. Hosp.*, 234 F. Supp. 2d 478, 485-86 (D.N.J. 2002) (quoting *Taylor v. Union Inst.*, 30 Fed. App'x 443, 452 (6th Cir. 2002)).

Defendants claim.  Fact issues therefore exist as to whether the decision to terminate Wilson was, in fact, made during or after Wilson's FMLA leave.

Second, genuine issues of material fact exist regarding whether younger Asset Managers – Aburrow, Ellis, and Formanek, were similarly situated to Wilson, as discussed, *supra*, at Section III(D)(1).  None of them requested FMLA leave and all were given more favorable treatment in that none of them were considered for position elimination and, after Wilson's termination, were promoted and/or transferred in accordance with Smith's "vision" of catering to these "next gen" employees rather than the older, ailing Wilson.

### 2.      Wilson can establish a causal connection between his FMLA leave and his termination merely two months later.

Close temporal proximity between the end of FMLA leave and an employee's termination can suffice to satisfy the causal connection requirement of an FMLA retaliation claim.  *See Morris*, 2019 U.S. Dist. LEXIS 133737, at *42-43 (citing *Richard v. Cingular Wireless LLC*, 223 F. App'x 334, 338 (5th Cir. 2007) ("two-and-one-half month period between protected activity and adverse employment action sufficient to establish causal connection needed for prima facie case")); *see also Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (up to *four months* between protected activity and adverse action can be sufficient to satisfy causal connection at summary judgment).[16] As previously discussed, *supra*, in ¶ 26, Defendants concede that Smith knew of Wilson's FMLA leave at least as of April 9, 2019, and there is ample evidence contesting Defendants contention that the decision to eliminate Wilson was made beforehand.  Therefore, barely more than two

---

[16]    Defendants' reliance on the *dicta* in *Wilson v. Noble Drilling Services, Inc.*, 405 F. App'x 909 (5th Cir. 2010), is misplaced.  In *Wilson*, the Court ruled there was no protected activity – the plaintiff had merely said he "might" need FMLA leave or that it was a "possibility," unlike here where there is no question that Wilson actually took protected FMLA leave.  *See* 405 F. App'x at 913.  Any potential reliance Defendants might attempt in *Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395 (5th Cir. 2012), would also be misplaced.  There, the employee had exhausted his FMLA entitlement and was ineligible for further FMLA protection *while still on un-protected leave* when his position was eliminated.  *See Amsel*, 464 F. App'x at 401-02.

months had elapsed between when Wilson was cleared to return from FMLA leave on April 15, 2019, and when he was terminated on June 19, 2019, and *less than two months* between April 15th and the June 10th Management Committee meeting during which Defendants ostensibly made the actual decision to terminate Wilson. Therefore, the temporal proximity of Wilson's FMLA leave and his termination falls within the Fifth Circuit's allowable time-frame to satisfy the causation element of Wilson's prima facie case. This same temporal proximity, when taken together with the other evidence of pretext discussed below, also evidences that Wilson's termination was mere pretext for terminating him because of his FMLA leave.[17]

### 3. Additional evidence establishes a causal connection between Wilson's FMLA leave and his termination.

The evidence shows that Holly Dinan, L&B's novice, untrained HR Director and a member of L&B's Management Committee – the same body that the Defendants allege made the decision to eliminate Wilson's position – had the requisite retaliatory animus to push for Wilson's termination based on her knowledge of his FMLA leave and the effect of his medical issues on L&B's insurance costs. Plus, she kept Smith and the rest of the Management Committee apprised of Wilson's FMLA status and regularly updated them on employee healthcare costs. The close tabs that Dinan kept not only on employees' ages, but also on L&B's medical spending, gave her the ability to correlate an employee's inclusion on the high-cost claimant report with their FMLA leave requests. In fact, Dinan prided herself on keeping L&B's health care costs low – her primary goals for years was to reduce them, and she celebrated having reduced the overall medical spend in her performance evaluation just months after Wilson's termination.

---

[17]   *See, e.g., Garcia v. Prof'l Contract Servs.*, 938 F.3d 236, 243-46 (5th Cir. 2019); *Kibbie v. Hays Consol. ISD*, No. A-19-CV-393-SH, 2020 U.S. Dist. LEXIS 60844, at *22-24, 2020 WL 1695688 (W.D. Tex. Apr. 7, 2020).

She also had closed-door meetings with Smith and Plumlee after Wilson's FMLA leave began where they discussed his medical leave [*see* APP 184 and 186-188 (Smith Depo 235:11-20, 237:9 - 239:9)].  Despite knowing Wilson's planned return date from his FMLA form, she told Smith that she did not know when he would return – certainly inferring Wilson would be out for an indefinite period of time instead of only two weeks as reflected on the form [*see* APP 244]. Dinan was also listed in the April 9, 2019 Management Committee meeting minutes as leading the cryptically worded "realignment of retail staffing," which was the first mention of any such staff realignment in these meetings.

In other words, Dinan, an individual with knowledge of Wilson's FMLA leave and possessing a self-professed motivation to reduce employer medical spend, as well as a prior history of targeting "high-cost" claimants, was not only a decisionmaker with respect to the decision to eliminate Wilson's position, but had clear influence over other decisionmakers. As a result, Wilson can prove a causal connection between his FMLA request and the decision to eliminate his position. Therefore, summary judgment should be denied as to Wilson's prima facie case of FMLA retaliation.

### 4.    Defendants' proffered reason for terminating Wilson is false and merely a pretext for FMLA retaliation.

Summary judgment should also be denied as to Wilson's FMLA retaliation claim because sufficient evidence of pretext exists.  For the same reasons discuss, *supra*, at Section III(C)(3)(b), Defendants' every-changing reasons for terminating Wilson are unworthy of credence and numerous issues of fact exist regarding the supposed need to eliminate his position due to the supposed downturn and his lack of ARGUS training, and whether Defendant are attempting to hide the fact of his replacement with a job title change.  *Id.*

Together with the substantial evidence of pretext is the suspicious timing of Wilson's termination relative to his FMLA leave. *See Garcia*, 938 F.3d at 243-46; *Kibbie*, 2020 U.S. Dist. LEXIS 60844, at *22-24, 2020 WL 1695688. Setting aside the highly questionable contention of Defendants deciding in February 2019 to terminate him, Defendants must therefore have determined to terminate his employment either while he was on FMLA leave or, at most, two months after he returned from leave, which is when he was informed of the termination. Additionally, in contradiction to Smith's professed obsession with long-term succession planning, it is suspicious that Defendants would not have notified Wilson sooner that the alleged downturn in retail assets was necessitating changes within the department resulting in his position being eliminated, and a step-down plan could have been implemented for Wilson.

Therefore, substantial evidence of pretext in addition to the suspicious timing of Wilson's termination demonstrate that summary judgment should be denied as to Wilson's FMLA retaliation claim.

## F.     WILSON'S ERISA CLAIM SHOULD BE TRIED BEFORE A JURY

Under Section 510 of ERISA, an employer is prohibited from discharging or discriminating against a participant or beneficiary "for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C § 1140. To establish a prima facie case under Section 510 of ERISA a plaintiff must show that (1) he suffered an adverse employment action; 2) taken for the purpose of interfering with the attainment of (3) any right to which the employee is entitled. *Montes v. Phelps Dodge Indus.*, 481 F. Supp. 2d 700, 712 (W.D. Tex. 2006) (citing *Bodine v. Employers Cas. Co.*, 352 F.3d 245, 250 (5th Cir. 2003)).

While specific discriminatory intent is an essential element of the retaliation claim, "a plaintiff need not prove that the discriminatory reason was the only reason for discharge." *Schutze*, 2006 U.S. Dist. LEXIS 73734, at *18. As with Wilson's other claims, once he establishes a prima

facie case, the burden shifts to the Defendants to state a non-discriminatory reason for its actions; Wilson then must present a fact issue that Defendants' reasons are mere pretext.[18] *Id*.

### 1. Wilson can establish that Defendants had the specific intent to interfere with Wilson's ERISA benefits.

Specific discriminatory intent can be proven by circumstantial evidence. *Id*. Proximity of time between the adverse employment decision and the request or vesting of ERISA benefits is also a factor in establishing an ERISA claim. *Montes*, 481 F. Supp. 2d at 713; *see also Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927-28 (5th Cir. 1999) (collecting cases and finding proximity between plaintiff's termination and claim for benefits, in combination with evidence that the decision to terminate plaintiff was not made before the claim for benefits, sufficient to establish specific intent).

In the present case, Wilson can establish significant circumstantial evidence such that a reasonable jury could find that Defendants had the specific intent to deny Wilson continued access to health coverage and reap the resulting savings. First, as discussed above, there is a genuine fact issue regarding the timing of the decision to terminate Wilson, contradicting Defendants' claim that the decision was made prior to Wilson's cancer diagnosis and surgery. *See* discussion, *supra*, Section III(C)(1). Both the meeting minutes and the deposition testimony indicate that Dinan informed Smith and Plumlee of Wilson's medical leave in early April 2019, and that the decision to terminate Wilson was actually made in the late spring of 2019, either during or after Wilson's medical leave to receive surgery for cancer. *See* discussion, *supra*, Section III(C)(1). In addition, Wilson received notice of the elimination of his position approximately a month after his use of employee benefits, by which time Wilson had already been noted in the iCAF report as a high-cost

---

[18]   In the Motion for Summary Judgment, Defendant Smith does not attack Plaintiff's allegation that he is a proper defendant along with L&B under the FMLA.

claimant [*see* APP 378; *see also* APP 399-404]. As in *Nero*, the fact issues concerning the timing of the decision to terminate Wilson, in connection with the proximity of the elimination of his position and his use of employer health benefits raise a fact issue sufficient to establish specific intent. *See Nero*, 167 F.3d at 927-28.

Additionally, as discussed above, one of Dinan's primary goals as Defendants'  HR Director was reducing the overall employer health care spend [*see* APP 299]. On a prior occasion, Dinan used the high-cost claimant report to make decisions resulting in the elimination of high-cost employee spouse beneficiaries from L&B's employer coverage [*see* APP 70-71 (Dinan Depo 142:4-143:2)]. In 2019, Wilson appeared on the high-cost claimant report contained in the 2019 iCAF report [*see* APP 399-404; *see also* APP 378]. On April 9, 2019 Dinan gave a presentation about staffing in the retail department to the Management Committee during Wilson's FMLA leave [*see* APP 255-256].  She also had closed-door meetings with Smith and Plumlee regarding Wilson's medical leave, and led the effort to "realign" the Retail Asset Management department that resulted in only him being terminated in favor of three younger, non-disabled employees. The same year that Wilson was eliminated, Dinan celebrated the successful reduction of L&B's overall employer health care costs [*see* APP 299]. Thus, a reasonable jury could infer that the decision to terminate Wilson was made after his use of employer health care benefits, and that at least one decisionmaker, as member of the Management Committee, had knowledge of Wilson's condition, a history of denying benefits to high-cost beneficiaries, and a self-professed goal of "reducing the overall employer benefit spend."

### 2. A genuine issue of fact exists concerning Defendants' knowledge of Wilson's diagnosis and need for additional treatment at the time of the adverse employment decision.

As discussed above, a fact issue exists as to the timing of the decision to eliminate Wilson. *See* discussion, *supra*, Section III(D)(2). Documents and testimonial evidence indicate that the

decision to eliminate Wilson's position actually occurred in the late spring of 2019. *See* discussion, *supra*, Section III(D)(2) [*see* APP 253]. Emails exchanged between Dinan and Wilson clearly establish that Dinan had knowledge of Wilson's cancer diagnosis [*see* APP 244 and 224]. Dinan also clearly knew of Wilson's potential need for additional testing and treatment, as evidenced by an email from Wilson to Dinan requesting an accommodation to work from home as a result of recovery-related incontinence [*see* APP 432]. As discussed above, Dinan informed both Smith and Plumlee of Wilson's need for medical leave prior to the April 9, 2019 Management Committee meeting [*see* APP 81 (Dinan Depo 210:17-23); *see also* APP 184-186 (Smith Depo 235:11-21, 236:24-237:1)]. When Dinan informed Smith of Wilson's medical leave, Smith states that Dinan told him she "did not know" how long Wilson would require medical leave [*see* APP 188 (Smith Depo 239:3-9)]. This conflicts with Wilson's own submitted FMLA requests, which stated a definitive start and end date, suggesting that Dinan was aware that Wilson may require more leave than he initially requested [*see* APP 244]. In stating to Defendant Smith that she did not know the duration of Wilson's leave, Dinan effectively imparted to Smith that Wilson may require additional leave beyond his documented FMLA request.  As a result, a reasonable jury could conclude that at least two decisionmakers on the Management Committee, among them Defendant Smith, knew of Wilson's need for additional treatment at the time Defendants decided to eliminate Wilson's position.

### 3.    The alleged "elimination" of Wilson's position was merely pretext for Defendants to save on future health insurance costs.

Defendants' focus on a lack of pretext, due to L&B's healthcare "restricted cash" not being freely available for L&B or Smith to spend, invest, or otherwise transfer, misses the point.  As discussed at length above, Wilson can identify ample evidence to support the fact that defendants reasons for eliminating Wilson's position are mere pretext. *See* discussion, *supra*, Section

III(C)(3)(b). In addition to those reasons, and in contrast to Defendants' arguments, Dinan's testimony confirms that L&B stood to save financially from the denial of benefits to high-cost claimants, including Wilson [*see* APP 54-55 (Dinan Depo 106:11-107:3)].

The present case bears a striking resemblance to the facts in *Nero*, where the Fifth Circuit upheld a jury verdict in favor of the employee based on nearly identical facts. *See Nero*, 167 F.3d at 927-28. Also in *Nero*, as is the case here, there was a significant fact issue as to whether the employer knew of the employee's costly medical condition. *See id.* at 926; discussion, *supra*, at Section III(C)(3). And, just as the employer in *Nero*, L&B's insurance is self-funded [*see* APP 54-55 (Dinan Depo 106:11-107:3)]; *cf. Nero*, 167 F.3d at 927. Their plan includes a "stop-loss" insurance threshold that kicks in when claims exceed L&B's deductible. *Id.* Exceeding the stop-loss insurance threshold was costly for L&B, as it would cause them to take their stop-loss insurance out to market and acquire a different stop-loss carrier. *Id.* However, when the L&B employees did not overutilize their employer health insurance, and thus did not exceed the "stop-loss" threshold, L&B would gain a surplus in their medical fund. *Id.* Surplus from years where L&B employees did not overutilize their health insurance would be applied to employee medical premiums for the subsequent year, resulting in savings for both L&B and its employees. *Id.* Dinan further testified that, in 2020, L&B had a surplus in its medical fund. *Id.* Wilson was the only L&B employee who departed the company in 2019.

Thus, a jury could infer in this case, as one did in *Nero*, that L&B not only stood to avoid incurring the cost and hassle of exceeding their deductible and acquiring a different stop-loss carrier, instead benefiting from a surplus in its medical fund by eliminating Wilson's position. Summary judgment should therefore be denied as to Wilson's claims under Section 510 of ERISA.

## IV.  CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety. Plaintiff further requests all additional relief, both at equity and in law, to which me may be entitled.

DATE: August 11, 2021                         Respectfully submitted,

_/s/ Jennifer J. Spencer_
**JENNIFER J. SPENCER**
Texas Bar No. 10474900
Email: jspencer@jacksonspencerlaw.com
**JAMES E. HUNNICUTT**
Texas Bar No. 24054252
Email: jhunnicutt@jacksonspencerlaw.com

**JACKSON SPENCER LAW PLLC**
Three Forest Plaza
12221 Merit Drive, Suite 160
Dallas, Texas 75251
Telephone (972) 458-5301
Facsimile (972) 770-2156

**ATTORNEYS FOR PLAINTIFF**
**TERRY WILSON**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of this document was served upon all attorneys of record as to all parties to the above case pursuant to the FEDERAL RULES OF CIVIL PROCEDURE on this, the **11th day of August, 2021**.

_/s/ Jennifer J. Spencer_
**JENNIFER J. SPENCER**