UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TERRY WILSON,               )
                                   )
         Plaintiff,       )
                                   )       CIVIL ACTION NO.
VS.                      )
                                   )       3:20-CV-2059-G
L&B REALTY ADVISORS, LLP and    )
GEORGE ANDREWS SMITH,     )
individually,               )
                                   )
        Defendants.    )

## MEMORANDUM OPINION AND ORDER

Before the court is the motion for summary judgment filed by the defendants

L&B Realty Advisors, LLP ("L&B"), and George Andrews Smith ("Smith"),

individually (collectively "defendants"). For the reasons stated below, the

defendants' motion is **GRANTED**.

## I. BACKGROUND

This suit alleges age and disability discrimination. L&B hired the plaintiff,

Terry Wilson ("Wilson"), to serve as Director of its retail asset management

department in February 2013. Defendants' Brief in Support of its Motion for

Summary Judgment ("Brief in Support of Motion") (docket entry 35) at 2. Wilson

was 57 years of age at the time of his hire.  *Id.* at 2; Defendant's [sic] Appendix in Support of its Motion for Support Judgment ("Appendix to Motion") (docket entry 36) at 2-3.  Wilson worked for L&B from February 2013 until his employment was terminated effective July 5, 2019, at which time he was 64 years of age.  Plaintiff's Original Complaint ("Complaint") (docket entry 1) at 2; Defendant's [sic] Motion for Summary Judgment ("Motion") (docket entry 34) at 1.

On or about January 1, 2016, Wilson was promoted to Vice President of the retail asset management department.  Brief in Support of Motion at 2; Appendix to Motion at 141.  Wilson's job duties as Vice President included supervising, mentoring, and training other members of the department, including Peter Aburrow ("Aburrow"), Will Ellis ("Ellis"), and Michael Formanek ("Formanek").  Complaint at 3.  During his employment, Wilson directly reported to John Gerdes ("Gerdes"), Executive Vice President of the retail asset management department at that time. Appendix to Motion at 16; Appendix in Support of Plaintiff's Response Brief in Opposition to Defendant's [sic] Motion for Summary Judgment ("Appendix to Response") (docket entry 54) at 285.  Formanek, Ellis, and Aburrow reported directly to Gerdes, and Wilson helped supervise Formanek.  Appendix to Motion at 21; Appendix to Response at 285.

Throughout his employment, Wilson received positive performance reviews indicating that he was a "solid performer who meets all of L&B's high expectations of

-2-

performance standards and sometimes exceeds requirements."  Plaintiff's Brief in
Support of His Response in Opposition to Defendants' Motion for Summary
Judgment ("Brief in Support of Response") (docket entry 50) at 10; Appendix to
Response at 44-45, 266-74.  According to Smith and Dan Plumlee ("Plumlee"), Chief
Investment Officer/President, Wilson and Gerdes were the two most experienced
senior asset managers in the retail asset management department.  Appendix to
Response at 118, 133-34.  Wilson was invited to participate in the Partners Driving
Performance Equity Plan ("PDP") – a program designed to provide equity-based
incentive compensation to key employees.  Brief in Support of Response at 10;
Appendix to Response at 433.  In addition, Wilson worked with the Leadership
Council and was asked to join L&B's mentorship program as a mentor.  Appendix to
Response at 59-61, 266.  This program was designed to pair "leaders" of L&B with
junior and mid-level employees who were looking for advice on how to make the next
step in their career.  *Id.*

     L&B provides its employees with medical insurance through a self-funded
insurance plan.  Appendix to Response at 53.  Holly Dinan ("Dinan"), L&B's Vice
President of Human Resources, along with Plumlee, and sometimes Smith, regularly
met with L&B's insurance brokers to review analytics on their insurance plan referred
to as iCAF reports.  *Id.* at 148-53.  These iCAF reports include a section on the
company's "high-cost claimants."  *Id.*  The reports do not list employees on this

"high-cost claimants" chart by name, but rather include the gender, four-year age range, and specific medical condition responsible for the high cost.  Brief in Support of Response at 11-12; Appendix to Response at 378.  Dinan could generally discern who the "high-cost claimants" were, "especially if . . . they have requested FMLA." Appendix to Response at 70-71.  According to Dinan, Wilson's cancer diagnosis would have eventually placed him on the "high-cost claimant" report.  *Id.* at 69.

Dinan considered helping reduce "our overall [e]mployer spend for L&B's medical plan" to be a key accomplishment on her November 2019 performance review.  *Id.* at 299.  L&B, with the assistance of Dinan, also regularly monitored L&B's workforce for individuals approaching the "Medicare age" of 65.  *Id.* at 63.  In 2016 Dinan took note of employees at or nearing retirement age who "did not have anyone on their team to potentially back them up and identified those people as posing a risk" to L&B.  *Id.* at 63, 65.  According to Dinan, these individuals posed a risk because "[i]f they were to retire immediately, we would not have someone to fill their role."  *Id.* at 63.  Dinan's goal with this practice was to ensure "that if someone leaves, whether it's for retirement or anything else, that we have people in place to continue doing the work of those who left."  *Id.* at 63-64.  L&B's management committee asked Dinan about the "overall workforce age" and in response, Dinan identified "areas of risk based on those who are at retirement age and could at any point say 'I want to retire tomorrow.'"  *Id.* at 64.  According to Dinan, since 2016,

succession planning has been a regular topic at the management committee meetings, and the committee would periodically ask Dinan about the "workforce age." *Id.* at 65-66. Since she first reported on the relative workforce age in 2016 Dinan "started thinking that really anyone regardless of their age, if they didn't have any adequate backup, yet they played an important role within L&B, we needed to identify those employees and figure out if something happened . . . who would assume their role." *Id.* at 66.

Accordingly, in April 2017, members of L&B's management committee were asked to complete a first round of succession plans. Brief in Support of Motion at 3; Appendix to Motion at 68-70. Succession planning requires employees to determine what actions L&B would need to take to cover that employee's duties in the event of an immediate departure and a long-term plan for covering the employee's duties in the future. *Id.* During a second round of requests, Dinan asked L&B's Vice Presidents and heads of departments to prepare succession plans. Brief in Support of Motion at 3; Appendix to Motion at 109. Therefore, Wilson and Gerdes were asked to prepare succession plans in 2017. *Id.* Wilson submitted his succession plan to Dinan on May 8, 2017. Appendix to Motion at 68. Wilson and Gerdes each identified the other as their logical successor in the event of an immediate departure. Appendix to Response at 355, 358. Dinan, who reviewed the plans, found "no issues with [Wilson]'s succession plan" upon initial review. *Id.* at 83.

-5-

Beginning around August 2015, a number of L&B's clients started to sell or transition their retail assets.  Brief in Support of Motion at 3-4; Appendix to Motion at 136-37.  Four retail assets were sold in 2015 and 2016, along with an additional retail asset sold in 2017.  Brief in Support of Motion at 4; Appendix to Motion at 136-37.  One retail asset was acquired in 2017.  *Id.* Wilson managed most of the assets that were transitioned or sold during this time.  *Id.* In 2018, Wilson acknowledged that retail assets were out of favor with L&B clients.  Brief in Support of Motion at 4; Appendix to Motion at 65.

Between 2014 and 2018, L&B hired three employees to the retail asset management department.  Brief in Support of Response at 16.  In 2014, L&B hired Ellis as a Retail Analyst, and later promoted him to Retail Asset Manager in 2017.  Brief in Support of Response at 16; Appendix to Response at 322, 328.  Additionally, L&B hired Formanek in 2017, and Aburrow in 2018, both to Retail Asset Manager positions.  Brief in Support of Response at 16; Appendix to Response at 306, 309, 313.  When asked why Aburrow, Formanek, and Ellis were hired during this time in which L&B was experiencing a decline in retail assets, Smith stated that "[n]either John [Gerdes] nor Terry [Wilson] are going to sit behind the screen and crunch numbers.  They're vice presidents, they're experienced, they're a whole entirely different level, and the work was at a junior level.  It's a work that needed to be –

-6-

continued to be done because we still had retail assets." Appendix to Response at

175. In late 2018, Gerdes announced his intention to retire. *Id.* at 46-48, 136, 189.

On October 16, 2018, Smith emailed Wilson about a lunch meeting to discuss

Wilson's succession plan. Appendix to Motion at 71. Smith expressed that the

spotlight on succession planning had "grown even brighter" as L&B's clients and the

"next gen" both asked about these plans. *Id.* Smith also explained that he had

worked with other senior executives on their succession plans and that each plan

varied on a spectrum of immediate departure at a specified future date to slower step-

downs over a period of time. *Id.* Smith and Wilson met for lunch the following day

on October 17, 2018. Complaint at 3; Brief in Support of Motion at 4-5. According

to Wilson, Smith asked Wilson during this meeting how many more years he

planned to work for L&B. Complaint at 3. Wilson responded that he would like to

work five to six more years. *Id.* Wilson avers that Smith then replied that five to six

more years did not work for L&B and that he needed to show a career path for the

"next gen[.]" *Id.* Wilson also asserts that he asked Smith to explain what he had in

mind, but that Smith did not answer Wilson's question and instead stated they

would meet again and address the issue after the first of the year. *Id.* Wilson further

alleges he received no other information or communication on Smith's plans prior to

his termination, that no follow-up conversation about his succession plan ever

occurred, and that no step-down plan was ever discussed with him. *Id.*; Brief in

Support of Response at 13; Appendix to Response at 23-24, 168-70.  It appeared to Smith, however, that Wilson "stonewalled" Smith and Gerdes in subsequent discussions.  Appendix to Response at 166.

L&B's management committee meets quarterly and an ongoing topic of discussion at these meetings is succession planning and hiring needs. Brief in Support of Motion at 5; Appendix to Motion at 138.  Discussions about eliminating Wilson's position began in December 2018, two months after the lunch meeting between Smith and Wilson.  Appendix to Motion at 117, 138; Appendix to Response at 85.  The minutes from that meeting show that under "Succession Planning/Recent Hires/Openings" an "action item" for Smith was to "reengage Terry Wilson to better understand his vision."  Brief in Support of Response at 16; Appendix to Response at 251.  In Plumlee's view, Wilson's "succession plan[] proposed a timeline that was outside of . . . what we felt was appropriate for the department.  Way outside of it." Appendix to Response at 139-40.  Smith, Plumlee, and Dinan maintain that, during the February 2019 management committee meeting, the committee agreed to eliminate Wilson's position due to the declining number of retail assets but decided to discuss the appropriate timing of notifying him of his termination at the next meeting.  Brief in Support of Motion at 5; Appendix to Motion at 105, 138; Appendix to Response at 85.

Wilson was diagnosed with prostate cancer on March 18, 2019.  A week later, he met with Dinan and informed her of his diagnosis and need to take leave pursuant to the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq*. Complaint at 3.  Wilson asked Dinan if he needed to inform Smith, Plumlee, or the rest of the retail asset team about his cancer diagnosis.  Appendix to Motion at 31-32.  Dinan replied that he did not have to tell anyone he had cancer, just that he was going to be out for surgery.  *Id.*  Wilson then subsequently notified L&B of his need to take leave in order to undergo prostate surgery, but did not inform anyone other than Dinan that he had been diagnosed with cancer.  Complaint at 3.  Wilson asserts that Smith was informed of Wilson's diagnosis and his need to take leave for surgery. *Id.*  However, the defendants deny that any L&B employee besides Dinan had knowledge of Wilson's cancer diagnosis at that time.  Defendant George Andrews Smith's Original Answer and Affirmative Defenses to Plaintiff's Original Complaint (docket entry 8) at 2; Defendant L&B Realty Advisors, LLP's Original Answer and Affirmative Defenses to Plaintiff's Original Complaint (docket entry 9) at 2.  Wilson stated that he did not tell anybody at L&B besides Dinan about his cancer diagnosis and instead just told people he was going to have surgery and be out for a few weeks. Appendix to Motion at 33.

On April 1, 2019, Wilson submitted an FMLA leave request to Dinan to obtain surgery as part of his treatment plan.  Brief in Support of Response at 18;

-9-

Appendix to Response at 244.  The following day, April 2, 2019, while on medical leave, Wilson underwent prostate surgery, returning to work on April 15, 2019. Complaint at 3.  On April 8, 2019, Wilson's FMLA request was approved by L&B. Brief in Support of Response at 18; Appendix to Response at 224.  Wilson provided his team with an update on the surgery on April 8, 2019 and confirmed that he was available remotely until he was able to return to the office.  Appendix to Response at 278.  Due to impaired bladder functions resulting from surgery and other limitations, Wilson was permitted to work from home as needed for a time thereafter but was otherwise able to perform all essential functions of his job with or without reasonable accommodation.  Complaint at 3-4.  After working at home for a few days, Wilson returned to the office.  Appendix to Motion at 38.  Wilson did not require or request any other accommodation following his surgery and was granted all of the FMLA leave he requested from L&B.  *Id.* at 37, 54.

In preparation for the April 9, 2019 management committee meeting, Dinan met with Smith and Plumlee and informed them that Wilson was on medical leave and that "any decisions to continue on letting Terry go would have to be on pause until he was clear to return to work after FMLA leave."  Appendix to Response at 81. The April 9, 2019 management committee minutes reflect that Dinan "reported her on-going discussion regarding realignment of retail staffing."  *Id.* at 255.

Following Wilson's FMLA leave and return to work, two L&B retail assets that he primarily managed were marketed for sale.  Appendix to Motion at 39-43.  On or around early June 2019, Smith, Plumlee, and Dinan informed Gerdes of L&B's plan to eliminate Wilson's position.  Brief in Support of Motion at 7; Appendix to Motion at 138.  Gerdes supported the decision to eliminate Wilson's position.  *Id.*  After speaking to Gerdes, Smith, Dinan, and Plumlee presented the final plan to inform Wilson he was being terminated during the June 10, 2019 management committee meeting.  Brief in Support of Motion at 7; Appendix to Motion at 138.  The committee unanimously approved the proposal to promptly inform Wilson that his position had been eliminated.  *Id.*

As a result, on June 19, 2019, Smith, Dinan, and Gerdes met with Wilson and informed him that L&B was terminating his employment, effective July 5, 2019. Complaint at 4.  L&B presented Wilson with a severance package giving him the option to stay with L&B until July 5, 2019 and included severance pay and coverage of his COBRA premiums for the remainder of the year.  Brief in Support of Motion at 7; Appendix to Motion at 44-45.  Wilson was also informed that his "responsibilities, role, properties will now be absorbed by the remaining Asset Managers in the Retail Asset Management team."  Appendix to Response at 277. These remaining members included Gerdes, 64 years of age when Wilson was terminated, until his retirement in 2020, and Aburrow, Ellis, and Formanek all of

whom were under 40 years of age at the time of Wilson's termination.  *Id.* at 453.

Wilson accepted his severance package on June 21, 2019, and his last day of

employment at L&B was on July 5, 2019.  Appendix to Motion at 45, 47-48.

The defendants maintain that, to date, Wilson has not been replaced.  Brief in

Support of Motion at 7; Appendix to Motion at 139.  Rather, the defendants

contend that while remaining employees assumed Wilson's responsibilities, L&B has

not hired or promoted any individual to assume Wilson's former position of Vice

President.  *Id.*  On July 2, 2019, Smith sent an email to Gerdes saying he had "a

sense that 'retail' is shifting from a bad word to one of intrigue."  Appendix to

Response at 324-25.  On July 8, 2019, Aburrow, Ellis, and Formanek all received title

changes to "Senior Asset Manager."  Brief in Support of Motion at 8; Appendix to

Motion at 113-14, 139.  The defendants maintain that this was at Gerdes's request

in order to signify that these individuals were the main points of contact for their

assigned retail assets.  Brief in Support of Motion at 8; Appendix to Motion at 115-

16.  Ellis received a pay increase at this time, putting him in line with Aburrow's and

Formanek's base salaries as they all held the same position.  Brief in Support of

Motion at 8; Appendix to Motion at 132-33.  In addition, on October 1, 2019,

Formanek transferred from the retail asset management department to the portfolio

management department after the voluntary departure of another L&B employee at

-12-

which point Formanek was promoted to Director.  Appendix to Motion at 113-114, 139.

In November 2019, Gerdes noted on Aburrow's performance review "I believe that Peter [Aburrow] is ready for a promotion to Vice President of Retail Asset Management as I retire and he continues to work with Portfolio on the assets he has now and in the future."  Appendix to Response at 316.  However, this promotion did not happen and L&B insists it has not hired or promoted any individual to assume Wilson's former position.  Appendix to Motion at 139.

Gerdes retired in December 2020, and the defendants contend that no individual has replaced Gerdes in the role of Executive Vice President.  Brief in Support of Motion at 8; Appendix to Motion at 120.  Following Gerdes's retirement, Aburrow and Ellis were promoted to Directors of the retail asset management department.  Appendix to Motion at 114.  At this point, Aburrow and Ellis became responsible for the department and were asked to prepare succession plans.  Appendix to Response at 38, 108, 117.  Aburrow and Ellis were also invited to join L&B's revenue sharing program after their promotions.  *Id.* at 356.  In late 2019, L&B hired Andrea Troske ("Troske") to an analyst position "to supplement the retail asset management group."  *Id.* at 408.  The defendants urge that Troske was brought on as an "additional lower-level analyst to replace an analyst, Dominik Romano, who left earlier in 2019" rather than as a new position.  Defendants' Reply in Support of

-13-

Their Motion for Summary Judgment ("Reply") (docket entry 58) at 13; Appendix to Response at 49-50, Appendix in Support of Defendants' Reply in Support of Its [sic] Motion for Summary Judgment ("Appendix to Reply") (docket entry 59) at 168-69.

Wilson filed suit against L&B and Smith on August 4, 2020, alleging wrongful discharge as a form of discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, the FMLA, Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, and the Texas Commission on Human Rights Act ("TCHRA"), TEXAS LABOR CODE Chapter 21.  Complaint at 4.  The defendants filed their motion for summary judgment on June 29, 2021 on the ground that Wilson's discharge was based on legitimate, non-discriminatory business reasons entirely unrelated to his age, disability, utilization of FMLA leave, or ERISA benefits.  They ask this court to grant summary judgment on all claims.  Motion at 3.

## II.  ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a), (c)(1).[1]  A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham.").  To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in his favor.  *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)).  However, it is not incumbent upon the court to comb the record in search of evidence that creates a

---

[1]     Disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive."  *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).

genuine issue as to a material fact.  See *Malacara v. Garber*, 353 F.3d 393, 405 (5th

Cir. 2003).  The nonmoving party has a duty to designate the evidence in the record

that establishes the existence of genuine issues as to the material facts.  *Celotex*

*Corporation v. Catrett*, 477 U.S. 317, 324 (1986).  "When evidence exists in the

summary judgment record but the nonmovant fails even to refer to it in the response

to the motion for summary judgment, that evidence is not properly before the district

court."  *Malacara*, 353 F.3d at 405.

## B.  ADEA

Under the ADEA, an employer cannot "discharge any individual . . . because of

such individual's age."  29 U.S.C. § 623(a)(1); see also *Rachid v. Jack In The Box, Inc.*,

376 F.3d 305, 308-09 (5th Cir. 2004).  The plaintiff must prove intentional

discrimination to establish a violation of the ADEA.  See *Armendariz v. Pinkerton*

*Tobacco Company*, 58 F.3d 144, 149 (5th Cir. 1995), *cert. denied*, 516 U.S. 1047

(1996).  To establish an ADEA claim, the plaintiff must show that his age was the

"but-for" cause of his termination and merely proving that age was a "motivating

factor" is not enough.  *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (2009)

(concluding that an ADEA plaintiff "must prove, by a preponderance of the evidence,

that age was the 'but-for' cause of the challenged adverse employment action"); see

also *Moss v. BMC Software, Inc.*, 610 F.3d 917, 928 (5th Cir. 2010) ("[T]he Supreme

Court rejected the application of Title VII's 'motivating factor' standard to ADEA

cases.") (citing *Gross*, 557 U.S. at 173-78)).  A plaintiff may prove that age was the

but-for cause of his firing with direct or indirect evidence.  *McMichael v. Transocean*

*Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) *(*citing *Kilgore v.*

*Brookeland Independent School District*, 538 F. Appx. 473, 475-76 (5th Cir. 2013) (per

curiam) (unpublished)); see also *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th

Cir. 2012).

"Direct evidence of discrimination . . . prove[s] the existence of a

fact . . . without any inferences or presumptions."  *Bodenheimer v. PPG Industries, Inc.*,

5 F.3d 955, 958 (5th Cir. 1993).  Direct evidence most often takes the form of a

discriminatory statement directly connected to the plaintiff's termination.

*McMichael*, 934 F.3d at 456; *see also* Moss, 610 F.3d at 929.

If the plaintiff cannot prove his case with direct evidence of discriminatory

motive, he can still rely on indirect evidence.  When confronting indirect evidence,

courts use the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802-805 (1973); see *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.

133, 142 (2000); *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1504-1505 (5th

Cir. 1988).  Under this framework, a plaintiff must first "put forth a prima facie

case."  *Berquist v. Washington Mutual Bank*, 500 F.3d 344, 349 (5th Cir. 2007), *cert.*

*denied*, 552 U.S. 1166 (2008).  After making out a *prima facie* case, "the burden shifts

to the employer to provide a legitimate, non-discriminatory reason for the

-17-

employment decision." *Id.*  If the employer articulates such a reason, the plaintiff

must rebut the employer's explanation by showing that the reason given is merely

pretextual.  See *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378-79 (5th Cir.

2010).

At summary judgment, the plaintiff must offer enough evidence to raise a

genuine question of fact regarding his employer's reason for firing him.  *McMichael,*

934 F.3d at 456.  To show pretext, a plaintiff must present sufficient evidence for a

reasonable jury to believe that the employer's "reasons are pretexts for unlawful

discrimination." *Bienkowski*, 851 F.2d at 1505.  A plaintiff can do so by showing that:

(1) "a discriminatory reason more likely motivated" the employer, *id.*; (2) the

employer's "reason is unworthy of credence," *id.*; or (3) he was "clearly better

qualified' than the person selected for the position." *Burrell v. Dr. Pepper/Seven Up

Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cir. 2007).  "The plaintiff retains the

burden of persuading the fact finder that impermissible discrimination motivated the

adverse employment decision." *Bienkowski*, 851 F.2d at 1505.

### 1.  *Direct Evidence*

Wilson points to the following pieces of evidence and asserts that they provide

direct evidence of discriminatory animus:  (1) Smith's email to Wilson regarding

succession planning in which a reference is made to the "next gen" having questions

about succession plans, Appendix to Response at 427; (2) Smith telling Wilson that

-18-

his proposed retirement timeline did not work for Smith, Brief in Support of Response at 22-23; (3) Plumlee's statement that Wilson's proposed timeline was outside what L&B felt was appropriate for the department, Appendix to Response at 139-40; (4) L&B's close monitoring of employees nearing 65 years of age in order to ensure that these individuals had succession plans in place, *id.* at 63-64. Wilson then points to various occurrences after he left L&B in his attempt to show that Smith had a "vision" of removing Wilson in favor of the "next gen." Brief in Support of Response at 24. First, Wilson contends that the promotions of Ellis, Aburrow, and Formanek to Senior Asset Manager, and Aburrow's and Ellis's subsequent promotions to Director provide direct evidence that he was discriminated against on account of his age. *Id.*; Appendix to Response at 275-76, 328. Additionally, Wilson asserts that Gerdes's step-down and ultimate retirement during this period, along with his recommendation that Aburrow be promoted to Vice President, both provide direct evidence of discriminatory animus towards Wilson. Brief in Support of Response at 24. Finally, Wilson points to Ellis's and Aburrow's invitations to join the L&B revenue sharing program in support of his contention that direct evidence proves age discrimination in this case. *Id.*

Wilson has failed to identify direct evidence of age discrimination. With regard to the email from Smith to Wilson in which Smith references the "next gen," Wilson fails to show that this is direct evidence of age discrimination. A plaintiff

may attempt to show discriminatory motive in both direct and indirect evidence cases

by pointing to specific comments made by a person in charge of terminating him.

See *McMichael*, 934 F.3d at 457.  Because Wilson alleges that this comment offers

direct evidence of discriminatory motive, it must "be direct and unambiguous,

allowing a reasonable jury to conclude without any inference or presumptions that

age was an impermissible factor in the decision to terminate the employee." *Equal

Employment Opportunity Commission v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th

Cir. 1996).  Specifically, the comment "must be '1) age related, 2) proximate in time

to the employment decision, 3) made by an individual with authority over the

employment decision at issue, and 4) related to the employment decision at issue.'"

*McMichael*, 934 F.3d at 457 (quoting *Moss*, 610 F.3d at 929).  These comments must

meet a demanding standard because the plaintiff is relying upon them "to prove the

entire case of discrimination."  *Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470,

475 (5th Cir. 2015).  The Fifth Circuit has held that "stray remarks" do not

demonstrate age discrimination.  *Texas Instruments Inc.*, 100 F.3d at 1181 (5th Cir.

1996); see, e.g., *Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir. 1993) (a

statement by a decisionmaker that an employee was an "old ____" and that a younger

person could complete his work faster was a stray remark insufficient to establish age

discrimination); *Guthrie v. Tifco Industries*, 941 F.2d 374, 378-79 (5th Cir. 1991)

(holding that such "statements are too vague to be accepted as direct evidence of

-20-

age-bias."), *cert. denied*, 503 U.S. 908 (1992); *Turner v. North American Rubber, Inc.*, 979 F.2d 55, 59 (5th Cir. 1992) (vague and remote remarks cannot establish age discrimination).

Not only does this comment not reference age in a stereotypical or derogatory way, this court has also previously found that mention of the "next generation" does not constitute sufficient evidence of age discrimination where the statements "were not proximate in time or related to the employment decision at issue." *Bell v. Raytheon Co.*, No. 3:08-CV-0702-G, 2009 WL 2365454, at *7 (N.D. Tex. July 31, 2009) (Fish, J.). Smith's mention of the "next gen" in his email did not refer to Wilson's age. Rather, Smith was informing Wilson of the importance of high-level executives like Wilson providing succession plans in order for the "next gen" to see how their supervisors envision their departments running after they retire. The Fifth Circuit has opined that "[a]n employer's inquiry into an employee's . . . retirement plans is not by itself evidence of discriminatory intent." *Rexses v. The Goodyear Tire & Rubber Co.*, 401 F. Appx. 866, 869 (5th Cir. 2010). Additionally, this comment about the "next gen" being interested in succession planning and the entire conversation about succession planning is unrelated to L&B's eventual decision to eliminate Wilson's position. This is not direct evidence of age discrimination, as it does not establish that but-for Wilson's age he would not have been terminated. Finally, the comment was made too remotely, as it was sent almost four months

-21-

before the evidence shows the decision to eliminate Wilson's position was made and almost eight months before Wilson was notified of his termination. Therefore, it is not direct evidence of discriminatory motive.

As for the other purported "direct evidence" relied on by Wilson, none comes close to "prov[ing] the entire case of discrimination." See *Goudeau*, 793 F.3d 475. The fact that Aburrow, Ellis, and Formanek received promotions, joined the Revenue Sharing Program, or that Gerdes continued his step-down and ultimate retirement after Wilson's departure require many inferential steps before the conclusion can be reached that Wilson was discriminated against on account of his age. Wilson, therefore, has produced no direct evidence of age discrimination.

When, as here, the plaintiff cannot prove his ADEA claim with direct evidence, he must rely on indirect evidence. *McMichael*, 934 F.3d at 456. When analyzing indirect evidence, courts use the *McDonnell Douglas* burden-shifting framework. The plaintiff must first put forth a *prima facie* case. *Id.* Then, "the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Berquist*, 500 F.3d at 349. If the employer articulates such a reason, the plaintiff must rebut the employer's purported explanation by showing that the reason given is merely pretextual. *Jackson*, 602 F.3d at 378-79.

2. *Prima Facie Case*

Wilson must establish a *prima facie* case of discrimination by showing that he was (1) discharged; (2) qualified for the position; (3) within the protected class; and (4) either (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of his age. *Armendariz*, 58 F.3d at 149. When an employee has not been replaced, prong (iii) of the fourth element applies. See *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995).

For the purposes of this motion, the defendants assume that Wilson can satisfy the first three elements of his *prima facie* case. The court will do the same. The defendants contend, however, that Wilson's *prima facie* case fails with respect to the fourth element – that he was replaced by someone outside the protected class, replaced by someone younger, or otherwise discharged because of his age. Motion at 1-2.

First, the defendants argue, and the court agrees, that Wilson failed to introduce sufficient evidence showing that he was replaced. Brief in Support of Motion at 12. The defendants consistently maintain that Wilson's position as Vice President of the retail asset management department was eliminated and the remaining members of the department assumed his duties. *Id.* "[A] terminated employee has not been 'replaced' when his position is eliminated and his former

-23-

duties are distributed among other co-workers." *Rexses*, 401 F. Appx. at 868 (citing *Dulin v. Dover Elevator Co.*, 139 F.3d 898 (5th Cir. 1998), which affirmed a district court's holding that "when an employee's position has been eliminated and the job duties reassigned to existing employees, that employee has not been replaced").

Wilson contends that he was actually replaced by Aburrow.  Brief in Support of Response at 26.  In support of this contention, Wilson points to the fact that three days after his termination, Ellis, Aburrow, and Formanek all received promotions to Senior Asset Manager.  *Id.* at 27; Appendix to Response at 275, 276, 328.  Wilson's title was Vice President prior to his termination, not Senior Asset Manager.  Additionally, Wilson points to Aburrow's and Ellis's further promotions to Director six months after Wilson's termination and argues that there being no significant difference between the job duties of a Director and a Vice President shows that Wilson was replaced by Aburrow.  Wilson also points to one of Aburrow's performance reviews, completed by Gerdes after Wilson's termination, where Gerdes indicated that Aburrow "is ready for a promotion to Vice President of Retail Asset Management as I retire . . . ."  Brief in Support of Response at 24; Appendix to Response at 316.

The defendants emphasize that, despite Gerdes's recommendation for Aburrow to be promoted to Vice President, L&B never accepted this recommendation and no such promotion ever took place.  Reply at 3.  Plumlee maintains that L&B has not

-24-

hired or otherwise promoted any individual to assume Wilson's former position. Appendix to Motion at 139.  The defendants do not dispute that Ellis and Aburrow were promoted to Director six months after Wilson's departure.  Reply at 4. However, the defendants highlight differences between the current Director position and Wilson's former Vice President position.  First, there are salary and vacation benefit differences between the positions.  Appendix to Response at 131-32. Additionally, Vice President and Director positions are on different levels of seniority evidenced by Wilson's own promotion from Director to Vice President in 2016. Reply at 4; Appendix to Motion at 141.  Furthermore, Aburrow and Ellis were not promoted to Director positions until six months after Wilson's departure and with the department restructuring that took place, the defendants maintain that there are now more differences in job requirements between Director and Vice President. Reply at 4.  Namely, the defendants point to Dinan's assertion that L&B would now require Directors in the retail asset management department to have ARGUS[2] experience – a qualification that Wilson admitted to lacking and not needing while Vice President.  *Id.* at 4-5; Appendix to Motion at 4-6, 97, 123.  The defendants further point to Plumlee's contention that Aburrow's, Ellis's, and Formanek's job

---

[2]      "Argus is a financial model used . . . in the valuation of real estate . . . [i]t's a model where you include revenues, expenses, capital, lease up assumptions, lease rollover, anything that would do that would impact that property with tenants coming in, or coming out, or the costs to operate it."  Appendix to Motion at 4.

duties differed from Wilson's as they had different skills, compensation levels, and job tasks.  Reply at 4; Appendix to Reply at 184.[3]

The competent summary judgment evidence shows that these employees occupied different positions with titles, compensation levels, benefits, and responsibilities that differed from Wilson's position.  Appendix to Reply at 184. Further, the plaintiff has failed to submit any competent summary judgment evidence refuting the sworn deposition testimony of Smith, Dinan, and Plumlee that Wilson's position was eliminated and L&B never hired or promoted a replacement to this position.  Therefore, Wilson has failed to show that Aburrow replaced Wilson, or that Wilson was replaced by anyone else.

Additionally, the defendants maintain that not only has Wilson failed to show that he was replaced but also he cannot establish that he was otherwise discharged because of his age.  Brief in Support of Motion at 13.  The court agrees.  Wilson argues that Dinan's admission that she took note of employees at or nearing retirement age who "did not have anyone on their team to potentially back them up and identified those people as posing a risk" to L&B, along with her discussion of the relative workforce age at management committee meetings in the context of

---

[3]     Smith also testified that "[n]either John [Gerdes] nor Terry [Wilson] are going to sit behind the screen and crunch numbers.  They're vice presidents, they're experienced, they're a whole entirely different level, and the work was at a junior level."  Appendix to Response at 175.

succession planning, shows that Wilson was otherwise discriminated against because of his age.  Brief in Support of Response at 28;  Appendix to Response at 62-66. Wilson contends that Dinan's "targeting" of employees approaching 65 years of age for succession planning demonstrates that L&B had an "ongoing and developing plan to transfer the responsibilities" of older employees to younger employees.  Brief in Support of Response at 28 (quoting and citing *Palasota v. Haggar Clothing Co.*, No. 3:00-CV-1925-G, 2001 WL 1142786, at *3 (N.D. Tex. Sept. 24, 2001) (Fish, J.)).

The defendants insist that Wilson is attempting to mislead the court about Dinan's deposition testimony, and other evidence, regarding succession planning. Reply at 7.  First, the defendants contend that L&B's focus on succession planning is not a veiled attempt to force out older employees in favor of younger ones, but rather it is "a way for the [f]irm to ensure that it is complying with its fiduciary obligations to its clients and employees by having a plan for a potential immediate departure of an employee and a long-term plan for a potential departure in the future." *Id.*; Appendix to Motion at 68, 138.  In addition, the defendants clarify that Dinan did not "target" employees at 65 years of age for succession planning.  Reply at 7. Rather, her statement reveals that she only identified employees nearing retirement age who "did not have a team to potentially support their role if they left" in order to make sure they created a plan for how their position should best be taken care of upon their eventual departure.  *See* Appendix to Response at 64-65.

-27-

Wilson attempts to align this case with *Palasota*.  In *Palasota*, the plaintiff offered evidence that over a period of time prior to his termination, his employer had "implemented policies" transferring responsibilities previously performed by sales associates, "generally males over forty years old," to those employed as retail marketing associates, "generally females under forty years old." *Palasota*, 2001 WL 1142786, at *1.  The plaintiff also pointed to specific age-related comments made about "a significant graying of the sales force." *Id.* at *3.  Additionally, the EEOC had issued a determination letter against the employer finding "reasonable cause to believe that the Charging Party and similarly situated Sales Associates were discharged based on their age, in violation of the ADEA." *Id.* at *3.  Discriminatory comments like those about a "graying of the sales force" are not found in this case.  Additionally, no similar evidence suggests L&B implemented a policy of transferring responsibilities from older employees to younger employees as was present in *Palasota*.  The mere fact that younger employees were retained when Wilson, at 64 years of age, was terminated is not sufficient on its own to establish a *prima facie* case of age discrimination.  This is especially true where, as here, there is no evidence of derogatory or stereotypical age-related comments.  Additionally, Dinan only identified employees nearing retirement age who "did not have a team to potentially support their role if they left." Appendix to Response at 64-65.  These individuals would be asked to complete succession plans because L&B was concerned about

-28-

"complying with its fiduciary obligations to its clients and employees . . . ."  Reply at 7; Appendix to Motion at 68, 138.  Therefore, the evidence shows that this "targeting" of employees reaching retirement age was not for the purpose of transferring their responsibilities to younger employees, but was to ensure that if they decided to retire, now that they were at retirement age, there was a plan in place to ensure a smooth transition of their responsibilities to other employees and seek their insight into how they imagine their role should be filled once they retired.

Wilson also argues that Smith's discussion of the interests of the "next gen" in connection with succession planning shows that Wilson was otherwise discharged because of his age.  Brief in Support of Response at 28; *see also* Appendix to Motion at 71.  For comments to provide circumstantial evidence of age discrimination, "the plaintiff must show that the comments involve '(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.'" *McMichael*, 934 F.3d at 457-58 (quoting *Squyres v. Heico Companies, L.L.C.*, 782 F.3d 224, 236 (5th Cir. 2015)).  The defendants assert that Wilson fails to show that Smith's "next gen" comment in the email to Wilson regarding their lunch meeting shows any discriminatory animus.  Brief in Support of Motion at 13; Appendix to Motion at 71-72.  Further, the defendants contend that Smith was simply informing Wilson that the next generation at L&B asks Smith about succession planning.  *Id.*

Wilson has failed to show that this comment from Smith expresses any preference for the "next gen" or any animus towards Wilson on account of his age. "[Co]urts will find evidence of age discrimination where a statement references age in a derogatory or stereotypical way." *McMichael*, 934 F.3d at 458; see, *e.g.*, *Rachid*, 376 F.3d at 315 (finding evidence of age discrimination where the employer told the plaintiff "you're too old"). Additionally, "courts will find evidence of age discrimination where the employer's statement shows a desire to replace older employees with younger ones." *McMichael*, 934 F.3d at 459; see, *e.g.*, *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576-78 (5th Cir. 2003) (finding sufficient evidence to sustain a jury verdict where the employer stated that the plaintiff's "sales techniques were out of the 'old school' of selling"; commented that "there was a 'graying of the sales force'" and the employer needed "to find a way to get through it;" and recommended severance packages for fourteen named employees, all of whom were specifically identified as over fifty years of age, to create "the flexibility to bring on some new players"), *cert. denied*, 540 U.S. 1184 (2004). Neither situation is present in this case because reference to the "next gen" being curious about succession planning does not reference age in a derogatory or stereotypical way or show a desire to replace Wilson with the "next gen." Therefore, Wilson failed to show that this comment demonstrates discriminatory animus.

-30-

Wilson also points to the fact that the defendants were aware that Gerdes, the only other employee over 40 years of age in the retail asset management department, was stepping down prior to making the decision to terminate Wilson as evidence that the defendants decided to transition the department to younger employees – Aburrow, Ellis, and Formanek.  Brief in Support of Response at 28-29; Appendix to Response at 136.  Further, Wilson contends that, after Wilson's elimination and Gerdes's step-down, all retail assets were managed by Aburrow and Ellis who were then given new job titles "that had no substantive difference in responsibilities from Wilson's."  Brief in Support of Response at 29.  Thus, Wilson argues, "[t]his fully matches with L&B not being satisfied with Wilson's retirement plan being too far in the future, as it did not cater to the 'next gen' and L&B's 'vision' for it . . . ."  *Id.*

The fact that L&B retained Gerdes over Wilson, knowing Gerdes was planning on retiring at some point, does not prove Wilson's case.  Plumlee maintains that Wilson's position was eliminated while Gerdes was allowed to step down and eventually retire "because he had greater tenure, clients were more familiar with him . . . and [he] was well-liked by our clients and by all of the staff here."  Appendix to Response at 135.  Wilson's disagreement with the defendants' decision to allow Gerdes to step down and eventually retire, or to keep lower-level employees performing different kinds of work, while letting Wilson go, is not competent summary judgment evidence that Wilson was discharged because of his age.

The court has reviewed the record and agrees with the defendants that Wilson failed to point to competent summary judgment evidence that he was replaced by Aburrow, or any other individual, or was otherwise discharged because of his age. Conclusory allegations are not competent summary judgment evidence, and are thus insufficient to defeat a summary judgment motion.  See *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsupported speculation, assertions, or inferences are also not competent summary judgment evidence.  See *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).  Wilson cannot prove his *prima facie* case solely from the fact that younger employees, Aburrow, Ellis, and Formanek, were retained while his position was eliminated.  Wilson's assertions that he was discharged because of his age are conclusory and speculative, and they are not supported by the competent summary judgment evidence.  For these reasons, the court finds that Wilson fails to put forth a *prima facie* case of age discrimination under the ADEA.  Accordingly, the defendants are entitled to summary judgment on this claim.

### 3. *Legitimate, Nondiscriminatory Reason and Pretext*

Even if the court assumes that Wilson has established a *prima facie* case of age discrimination, the defendants successfully articulated a legitimate, non-discriminatory reason for Wilson's termination.  Furthermore, the proof fails to show

that the defendants' proffered reason for Wilson's termination is a pretext for discrimination.

The defendants explain that the reason for Wilson's termination was the declining number of retail assets starting in August 2015, necessitating the elimination of Wilson's position. Brief in Support of Motion at 14. Beginning around August 2015, a number of L&B's clients started to sell or transition their retail assets. Appendix to Motion at 136-37. Retail assets were starting to decline in 2015; four assets were sold in 2015 and 2016, followed by an additional sale in 2017. *Id.*; Appendix to Response at 171. Wilson managed most of the assets that were transitioned or sold during this time. Appendix to Motion at 136-37. In a 2018 performance evaluation, Wilson acknowledged that retail assets were out of favor with L&B clients. *Id.* at 65.

The defendants have successfully set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, support a finding that unlawful discrimination was not the cause of the employment action. See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993). The defendants do not have to persuade the court that Wilson's termination was *actually* motivated by the decline in retail assets. All the defendants have to do to satisfy their burden of production is put forth evidence which, if believed by the trier of fact,

supports a finding that unlawful discrimination was not the cause of the plaintiff's termination. *Id.* The defendants have satisfied this burden of production.

Because the defendants successfully articulated a legitimate, non-discriminatory reason for Wilson's termination, the burden shifts back to Wilson to show that the reason proffered was merely a pretext for unlawful discrimination. To satisfy this burden, Wilson must show "that the legitimate reasons offered by the defendant[s] were not its true reasons, but were a pretext for discrimination." *See Reeves*, 530 U.S. at 143.

Wilson attempts to cast doubt on the severity of the retail decline as well as the necessity of eliminating Wilson's position. Brief in Support of Response at 29. First, Wilson contends that the defendants provided a variety of different reasons for Wilson's termination at different times–such as to the Texas Workforce Commission ("TWC") – supporting a finding that the reason the defendants proffered in their summary judgment motion to this court is fabricated or unworthy of credence. *Id.* at 34. In addition, Wilson asks the court to find genuine issues of fact as to (1) whether Wilson's position was actually eliminated as opposed to filled by Aburrow; (2) whether the defendants' need to eliminate Wilson's position was based on a redundancy between him and Gerdes that was resolved by Gerdes's retirement; (3) why Smith chose to discuss Wilson's succession plan with him over a year after Wilson submitted it coupled with the fact Aburrow, Ellis, and Formanek were not

-34-

asked to complete succession plans at the same time; (4) why Wilson's position needed to be eliminated when L&B hired new, younger employees into the department during the same period of retail asset downturn; (5) why L&B could not have sent Wilson to ARGUS training if that was the deficiency that required him to be terminated; and (6) whether the decision to terminate Wilson represented a noteworthy departure from company policy and precedent, thereby establishing pretext. *Id.* at 32, 35, 43-44. The court will address each of the plaintiff's arguments in turn.

First, Wilson contends that the defendants offered inconsistent reasons for terminating Wilson, thereby supporting a finding that the reason being proffered before this court is fabricated. Brief in Support of Response at 34. Wilson points to statements the defendants made to the TWC about Wilson's management style, history with clients, forecasted declines in retail assets, concerns about having both Wilson and Gerdes occupying high level positions at the same time in a shrinking department, and issues with Wilson's succession plan as evidence that the defendants "previously asserted, and now abandoned, false reasons for terminating Wilson . . . ." *Id.* at 34-46; Appendix to Response at 345-52.

The Fifth Circuit has observed that "[a]n employer's inconsistent explanations for an employment decision 'cast doubt' on the truthfulness of those explanations." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quoting *Gee v. Principi*,

289 F.3d 342, 347-48 (5th Cir. 2002) and citing *Burrell*, 482 F.3d 408).  In *Burrell*,

the employer offered different explanations at different times for its decision to

promote an employee over the plaintiff in that case.  *Burrell*, 482 F.3d at 413.  Before

the EEOC the employer said that the plaintiff lacked "bottling experience," while

stating before the court that the plaintiff lacked "purchasing experience in the

bottling industry." *Id.*  This inconsistency coupled with other evidence in the record

suggesting that the plaintiff was better qualified than the employee ultimately

promoted allowed the court to conclude that "a genuine issue of material fact

remain[ed] regarding whether [the employer's] hiring decision was based on" the

nondiscriminatory reason advanced by the employer. *Id.*  Similarly, in *Caldwell*, the

plaintiff presented evidence raising a question of material fact as to whether the

defendants' rationale and reasons for terminating him were mere pretext due to

inconsistencies in their explanations over time.  *Caldwell*, 850 F.3d at 242-43.  In

*Caldwell*, the defendants' "explanations for Caldwell's dismissal have evolved from

insubordination to a lack of initiative." *Id.* at 243.  In addition, inconsistent

testimony existed among the defendants' employees about the true reason for the

plaintiff's dismissal in that case. *Id.*

Inconsistencies such as those present in *Burrell* and *Caldwell* are not found in

this case.  In their statement to the TWC, the defendants expressly state "[t]he

[d]ecrease of [r]etail [a]ssets [l]eads the [f]irm to [c]onsider [e]liminating Wilson's

-36-

[p]osition." Appendix to Response at 347. Although the statement to TWC also makes mention of other occurrences such as complaints about Wilson's management style, history with clients, forecasted declines in retail assets, concerns about having both Wilson and Gerdes occupying high level positions at the same time in a shrinking department, and issues with Wilson's succession plan, these are not offered in the TWC statement or before this court as the actual reasons for Wilson's termination. Rather, the defendants have consistently explained that the decline in retail assets led L&B to eliminate Wilson's position.

Wilson contends that there is a fact issue regarding whether Wilson's position was actually eliminated as opposed to filled by Aburrow. Brief in Support of Response at 43. However, Aburrow was hired as a Retail Asset Manager, a lower level position than Wilson's former Vice President position. Reply at 19; Appendix to Motion at 5-6, 97, 123, 134. For the reasons explained earlier, Wilson has failed to show that Aburrow replaced Wilson.

With regard to Wilson's contention that there is a fact issue concerning the necessity of eliminating Wilson's position, the court finds that Wilson has failed to point out any competent summary judgment evidence refuting the contentions of Smith,[4] Plumlee,[5] and Wilson[6] himself that retail assets were declining for the period

---

[4]      *See* Appendix to Motion at 93, 97 (Smith states that "assets started declining in 2015" and that with assets declining he was "worried about who is

(continued...)

beginning in August 2015 through Wilson's termination on June 19, 2019.  Smith
and Plumlee assert that discussions about how there was "too much horsepower in
the Retail Asset Department for two Vice Presidents" began back in December 2018.
Reply at 17; Appendix to Reply at 157-60, 178-79, 185.  Additionally, the
defendants were concerned about L&B's retail assets projecting to continue to
decrease in 2019 while five assets had already been sold or transitioned from 2015 to
2017.  Appendix to Motion at 136-37; Appendix to Response at 421.  Wilson argues
that it was pretextual that L&B kept Gerdes over Wilson when the firm knew Gerdes
was planning on retiring and was in the midst of a step-down plan.  Brief in Support
of Response at 36.  The defendants acknowledge that Gerdes was negotiating his
retirement plan when Wilson was discharged.  Reply at 18.  However, the defendants
maintain that Gerdes did not know the specific extent of his step-down and
retirement plan in February 2019  when the decision to eliminate Wilson's position

---

[4](...continued)
getting the work done, and the [Vice Presidents] really aren't doing the ARGUS work
that's necessary to get ahead of valuation declines and ahead of things that you need
to know to make tough decisions.").

[5]     *See* Appendix to Reply at 178 (Plumlee states that "[t]he runoff in retail
assets was the overriding factor" in deciding to eliminate Wilson's position); *see also*
Appendix to Motion at 136-37 (Plumlee cites specific assets bought and sold during
the time period at issue and declares "[w]ith the sale and transition of retail assets
starting in August of 2015, L&B's retail related work decreased.").

[6]     *See* Appendix to Motion at 65 (Wilson acknowledges in 2018
performance review that retail asset are "out of favor" with L&B clients).

was officially made. *Id.* The defendants argue that this, in combination with the fact that his step-down retirement agreement was actually executed months after Wilson was notified that his position was eliminated, and that Gerdes remained with L&B for over a year and a half after the last day of Wilson's employment, shows L&B was legitimately faced with a decision of which Vice President to retain at the time they decided to terminate Wilson's employment. *Id.* at 18-19.

As evidence of pretext, Wilson also points to Smith's decision to discuss Wilson's succession plan with him over a year after Wilson submitted it. Brief in Support of Response at 35. Wilson takes issue with the fact that none of the younger employees – Aburrow, Ellis, and Formanek – were asked to produce succession plans. *Id.* In a case where the plaintiff argued that being "encouraged to engage in succession planning" was evidence that he was otherwise discharged because of his age, the Fifth Circuit concluded that "[a]n employer's inquiry into an employee's age and retirement plans is not by itself evidence of discriminatory intent." *Rexses*, 401 F. Appx. at 868-69. Aburrow, Ellis, and Formanek were not initially asked to complete succession plans because they were not heads of departments or Vice Presidents. Appendix to Motion at 109-10. Dinan maintains that the reason Aburrow and Ellis were eventually asked to complete succession plans in 2020, once Gerdes officially scheduled to retire at the end of that year and after Aburrow and Ellis received promotions, was because L&B decided at that time to

have all those who were "responsible for the majority of their department" to complete succession planning. *Id.* Before Gerdes retired and while Wilson was Vice President, they were the heads of the department so there was no need for the lower level employees like Aburrow, Ellis, and Formanek to complete succession plans. Therefore, there is nothing pretextual about Wilson and Gerdes being asked to complete succession plans as heads of the department while lower level employees like Aburrow, Ellis, and Formanek were not asked to complete plans at that time.

Additionally, Wilson contends that the fact Smith did not personally reach out to him to continue the discussion on his succession plan after their lunch in October 2018 provides evidence of pretext. Brief in Support of Response at 36. However, whether or not Smith personally reached out to Wilson to discuss his succession plan after the lunch meeting has no bearing on whether the defendants' proffered reason for terminating Wilson is pretext for unlawful discrimination. Wilson also contends that there is a fact issue regarding why Wilson's position needed to be eliminated when L&B hired new employees during the same period of time retail assets were declining. Brief in Support of Response at 17. Ellis, Formanek, and Aburrow were hired between 2014 and 2017 and Smith maintains that the reason these employees were hired during that time regardless of the downturn was that "[n]either John [Gerdes] nor Terry [Wilson] are going to sit behind the screen and crunch numbers. They're vice presidents, they're experienced, they're a whole entirely different level,

-40-

and the work was at a junior level.  It's a work that needed to be – continued to be done because we still had retail assets."  Appendix to Response at 175.  When asked "[i]f assets are declining, are you not worried about how many asset managers the company is hiring?"  Smith responded "I am worried about who is getting the work done, and the [Vice Presidents] really aren't doing the ARGUS work that's necessary to get ahead of valuation declines and ahead of the things that you need to know to make tough decisions."  Appendix to Motion at 97.  Therefore, according to Smith, the work that needed to be done was work typically completed by lower level employees while work usually completed by higher level employees like Wilson was dwindling.  Additionally, the defendants maintain that Aburrow was hired as a replacement for an already existing third Asset Manager position, rather than for a newly created position.  Reply at 19; Appendix to Reply at 146-47.  Wilson further contends that his lack of ARGUS training could have been easily remedied by one day of training.  Brief in Support of Response at 39.  First, the defendants have not proffered Wilson's lack of ARGUS training as the reason for his termination.  Rather, the defendants explained that part of the reason why they chose to keep employees occupying the lower level analyst positions over a position like Wilson's was because a Vice President is not expected to complete grunt work like ARGUS evaluations; therefore, it made more business sense to keep the lower level employees who

conduct this valuable day-to-day grunt work over a more costly high-level position that is running out of work to manage.  Appendix to Response at 175.

Ultimately, it is not Wilson's or the court's place to second guess L&B's business decision to not send Wilson to ARGUS training rather than terminate him. See *Bell v. American Eagle Airlines*, No. CV 15-728-SDD-RLB, 2017 WL 1330201, at *5 (M.D. La. Apr. 6, 2017) ( "Plaintiff's disagreement with the correctness of his training, discipline, and ultimate termination by Defendant is not evidence of pretext, and the Court may not second-guess the business decision of the Defendant in this regard.").  Courts are not permitted to second guess an employer's business decision when conducting pretext analysis. *LeMaire v. Louisiana Department of Transportation & Development*, 480 F.3d 383, 391 (5th Cir. 2007).  The ADEA does not require employers to always make proper employment decisions, just non-discriminatory ones. *Id.*

Finally, Wilson alleges that the defendants' decision to eliminate Wilson's position was unprecedented and marked a distinctive departure from their past practices during economic downturns.  Brief in Support of Response at 32.  Wilson contends that because L&B did not have a layoff since Plumlee and Smith took over the reins at L&B, Wilson's termination was a departure from procedure establishing pretext. *Id.*  Additionally, Wilson points to Plumlee's inability to name a time since 2005 when L&B eliminated a position other than Wilson's. *Id.*; Appendix to

Response at 114.  Finally, Wilson argues that because L&B previously chose to reassign personnel from departments experiencing slowdowns to other departments, rather than terminating them, this is evidence of pretext.  *Id.*; Appendix to Response at 137-38.

A plaintiff may show pretext "by showing a departure from standard procedure."  *McMichael*, 934 F.3d at 459.  However, "mere deviations from policy, or a disagreement about how to apply company policy, do not show pretext."  *Id.* (see also *Campbell v. Zayo Group., L.L.C.*, 656 F. Appx. 711, 715 (5th Cir. 2016) (per curiam) (unpublished) holding that "mere disagreement with [the employer's] application of the [reduction-in-force] policy, without more, does not provide substantial evidence of pretext.").  Additionally, "[t]he ADEA does not 'protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.'"  *Id.* at 460 (quoting *Moss*, 610 F.3d at 926).  "Plaintiffs, therefore, must connect a departure from or misapplication of procedure to a discriminatory motive – an employer's 'disregard of its own hiring system does not of itself conclusively establish that improper discrimination occurred or that a nondiscriminatory explanation for an action is pretextual.'"  *Id.* (quoting *Risher v. Aldridge*, 889 F.2d 592, 597 (5th Cir. 1989)).  Wilson has not shown that the decision to eliminate Wilson's position was "unlawfully motivated."  *See id.* at 460.  Further, Wilson fails to provide evidence connecting a departure from

procedure to a discriminatory motive.  *See id.*  Therefore, he has only managed to point out a "mere deviation from policy" which does not rise to the level necessary to prove pretext.  *See id.* at 459.

Wilson fails to show that there are genuine issues of material facts regarding whether his age was the but-for cause of his termination.  See *Gross*, 557 U.S. at 180.  His own subjective belief that his termination was based on age is insufficient to support an ADEA claim.  See *Waggoner*, 987 F.2d at 1164.  To defeat the summary judgment motion here, Wilson was required to "do more than simply show that there is some metaphysical doubt as to the material facts."  See *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  Because Wilson fails to show a genuine issue of material fact with regard to whether he was replaced or otherwise discharged because of his age, he failed to put forth a *prima facie* case of age discrimination under the ADEA.

Additionally, even if he had put forth a *prima facie* case of age discrimination, the defendants proffered a legitimate nondiscriminatory reason for terminating Wilson.  Further, Wilson has failed to produce sufficient evidence for a reasonable trier of fact to find either that the defendants proffered reason for his termination is unworthy of credence or that a discriminatory reason more likely motivated the plaintiff's termination.  See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Thus, viewing the summary judgment evidence in the light most

favorable to Wilson as the nonmovant, the court finds that Wilson has not met his burden of presenting a genuine issue of material fact whether the defendants discriminated against him on account of his age.  Therefore, the defendants' motion for summary judgment on Wilson's ADEA claim is granted.

## C.  FMLA

"The FMLA has two distinct sets of provisions, which together seek to meet the needs of families and employees and to accommodate the legitimate interests of employers." *Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (internal quotations omitted).  The first set of provisions are "prescriptive: they create a series of substantive rights, namely, the right to take up to twelve weeks of unpaid leave under certain circumstances." *Id.*  The second set of provisions are "proscriptive: they bar employers from penalizing employees and other individuals for exercising their rights." *Id.*

The proscriptive provisions of the FMLA are set forth in 29 U.S.C. § 2615. First, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA.  *Id.* § 2615(a)(1).  Second, "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA.  *Id.* § 2615(a)(2).  Finally, Section 2615(b) prohibits persons from interfering with proceedings or inquiries related to the FMLA.  *Id.*

1. *FMLA Claims Under Section 2615(a)(1)*

Wilson brought claims against L&B and Smith under Section 2615(a)(1), which prohibits employers from "interfering" with an employee's ability to take FMLA leave.  29 U.S.C. § 2615(a)(1).  To present a claim under Section 2615(a)(1), "a plaintiff must show that (1)[ ]he is an eligible employee under the FMLA, (2) the defendant is an employer subject to the requirements of the FMLA, (3)[ ]he was entitled to FMLA leave, (4)[ ]he gave notice to the defendant of [his] intention to take FMLA leave, and (5) the defendant denied [him] the benefits to which, under the FMLA, [ ]he was entitled."  *Morgan v. Nieman–Marcus Group, Inc.*, No. 3:05-CV-0079-G, 2005 WL 3500314, at *4 (N.D. Tex. Dec. 20, 2005) (Fish, Chief J.).

Wilson maintains that the defendants violated section 2615(a)(1) because they terminated his employment two months after he returned to work from FMLA leave.  Complaint at 6.  Wilson contends that this action was to interfere with, restrain, or deny the exercise or attempt to exercise his rights under the FMLA.  *Id.* at 7.

In response, the defendants contend that Wilson cannot establish his *prima facie* FMLA interference claim because he cannot satisfy the fifth element – that his employer denied him the benefits to which he was entitled under the FMLA.  Motion at 2.  The defendants did not deny Wilson any benefits under the Act evidenced by the fact that the defendants granted him all of the leave he requested.  *Id.*  Wilson

-46-

does not dispute that he was granted all of the leave he requested.  Appendix to Motion at 54.  Because the defendants granted Wilson all of the FMLA leave he requested, Wilson has failed to show that the defendants interfered with his rights under FMLA by denying him the benefits to which he was entitled.  As a result, Wilson's claim under section 2615(a)(1) fails, and summary judgment on this claim is granted.

## 2.  *FMLA Claims Under Section 2615(a)(2)*

Wilson also brought an FMLA claim under section 2615(a)(2), which bars employers from discharging or discriminating against any individual who exercises FMLA-protected rights.  29 U.S.C. § 2615(a)(2); *Amsel v. Texas Water Development Board*, 464 F. Appx. 395, 401 (5th Cir. 2012).  "When an employee claims that an employer has punished [him] for exercising [his] right to take FMLA leave, that claim is analyzed under the *McDonnell Douglas* framework." *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 768 (5th Cir. 2001).

To make out a *prima facie* case of retaliatory discharge under the FMLA, the employee must show "(1) the employee 'engaged in a protected activity' under the FMLA, (2) 'the employer discharged' the employee, and (3) a 'causal link [exists] between the protected activity and the discharge.'" *Lindsey v. Bio-Medical Applications of Louisiana, L.L.C.*, 9 F.4th 317, 324 (5th Cir. 2021) (quoting *Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 332 (5th Cir. 2005)).  In the Fifth Circuit, "it

-47-

is unclear whether a mixed-motive causation standard is ever proper for FMLA retaliation claims." *Adams v. Memorial Hermann*, 973 F.3d 343, 353 (5th Cir. 2020). In *Richardson*, the Fifth Circuit endorsed the mixed-motive causation standard as one option a district court may apply to FMLA retaliation claims. *Richardson*, 434 F.3d at 333. However, *Richardson*'s viability is "dubious" in light of two recent Supreme Court cases suggesting the mixed-motive causation standard might not be proper for FMLA retaliation claims. *Adams*, 973 F.3d at 353 (citing *Gross*, 557 U.S. at 180; *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362-63 (2013)); see also *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389-90 & n.11 (5th Cir. 2013) (noting that *Gross* and *Nassar* "limited the applicability of the mixed-motive framework" in other employment discrimination statutes but leaving the question of their effect on FMLA claims "for another day"). The Fifth Circuit stated "only that a court ought to apply the 'mixed-motive framework in appropriate cases.'" *Adams*, 973 F.3d at 353 (quoting *Richardson*, 434 F.3d at 334). Such cases include when "the district court has before it substantial evidence supporting a conclusion that both a legitimate and illegitimate (i.e., more than one) motive may have played a role in the challenged employment action." *Id.* (quoting *Smith v. Xerox Corp.*, 602 F.3d 320, 333 (5th Cir. 2010)). If a district court does not have substantial evidence before it supporting a conclusion that both a legitimate and illegitimate motive may have played a role in the employment action, then the court would not abuse its

-48-

discretion in determining that the case does not involve mixed motives. *Id.* at 354. Here, Wilson has failed to put forth sufficient evidence supporting a conclusion that both a legitimate and illegitimate motive played a role in his termination. Therefore, this court concludes that this case does not involve mixed-motives.

A plaintiff who establishes a *prima facie* case is entitled to a "presumption that the employer discriminated against" them. *Lindsey*, 9 F.4th at 324 (citing *Burdine*, 450 U.S. at 254 & n.7). "[W]here the employee fails to provide 'direct evidence of discriminatory intent,' the employer can rebut the presumption of discrimination by 'articulat[ing] a legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* at 325 (quoting *Richardson*, 434 F.3d at 332). This does not require the employer to "persuade the court that it was actually motivated by the proffered reasons." *Id.* (citing *Burdine*, 450 U.S. at 254). "It is sufficient if the defendant[] . . . clearly set[s] forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Id.* (citing *Burdine*, 450 U.S. at 254-55). To prevail in such a case, the plaintiff must raise an issue of material fact that the employer's proffered reason was pretextual. *Caldwell*, 850 F.3d at 245. The defendants do not dispute that Wilson has satisfied the first two elements of an FMLA retaliation claim. Brief in Support of Motion at 22. Rather, the defendants contest Wilson's ability to establish the third element – that a causal link exists between his taking of FMLA

leave and his discharge.  *Id.*  Therefore, the court will only focus on the disputed third element.

Wilson alleges that the temporal proximity of his FMLA leave and his termination show a causal link between the protected activity and discharge.  Brief in Support of Response at 46.  "When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the 'temporal proximity' between the FMLA leave, and the termination."  *Mauder v. Metropolitan Transit Authority*, 446 F.3d 574, 583 (5th Cir.), *cert. denied*, 549 U.S. 884 (2006).  The Supreme Court has acknowledged that when temporal proximity is "very close," proximity alone suffices to establish causation in a *prima facie* case of retaliation.  See *Besser v. Texas General  Land Office*, 834 F. Appx. 876, 884 (5th Cir. 2020) (citing *Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001)).  There is some disagreement within the Fifth Circuit "as to when temporal proximity, standing alone, is sufficient to allow an inference of causation at summary judgment." *Id.*; see also *Porter v. Houma Terrebonne Housing Authority Board of Commissioners*, 810 F.3d 940, 948-49 (5th Cir. 2015) (acknowledging that "this court has accepted a two-and-a-half-month gap as sufficiently close in one case, and rejected nearly the same timeframe in another").  The Fifth Circuit recently recognized and cited a Supreme Court decision which favorably cited a decision holding that three months was not within the "very close" requirement.  See *Breeden*, 532 U.S. at 273-74 (citing

*Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (concluding that a three-month period was insufficient)).  Citing *Breeden*, the Fifth Circuit recently concluded that "two and one-half months between the protected activity and the adverse employment decision, standing alone, is not within the 'very close' proximity that is necessary to establish causation."  *Besser*, 834 F. Appx. at 885.

Wilson maintains that a fact issue exists as to when the adverse employment decision was actually made.  Wilson contends that "barely more than two months had elapsed between when Wilson was cleared to return from FMLA leave on April 15, 2019, and when he was terminated on June 19, 2019, and less than two months between April 15th and the June 10th Management Committee meeting during which the defendants ostensibly made the actual decision to terminate Wilson."  Brief in Support of Response at 46-47 (emphasis omitted).  On the other hand, the defendants insist that the decision to terminate Wilson was made during the February 2019 management committee meeting.  Brief in Support of Motion at 18; Appendix to Motion at 105, 117, 127-29.  The defendants maintain that Wilson did not inform Dinan of his cancer diagnosis until March 25, 2019, after the employment decision was already made in February 2019.  Brief in Support of Response at 18; Appendix to Motion at 30-31, 73, 121-22, 124.  Additionally, Wilson asserts that he never told anybody in the office, besides Dinan, about his cancer diagnosis.  Appendix to Motion at 33.  Therefore, the defendants maintain

that Wilson cannot establish a genuine issue of material fact on the third element of his *prima facie* retaliation claim – that a causal link exists between the protected activity and the discharge.  Motion at 2.

Wilson has failed to put forth competent summary judgment evidence refuting the sworn deposition testimony of Smith, Plumlee, and Dinan that the decision to terminate Wilson occurred in February 2019.  Appendix to Motion at 105 (Smith deposition),  117, 127-29 (Dinan deposition), 138 (Plumlee declaration).  Smith maintains that the decision was made during the February 2019 management committee meeting.  Appendix to Motion at 105.  Smith further contends that while L&B decided to postpone notifying Wilson of his termination once he was informed of his FMLA leave, the actual decision to terminate Wilson had already been made at that time and the only issue left to decide at subsequent meetings was when Wilson would be informed of his termination.  Appendix to Motion at 104; Appendix to Response at 186-87.  Plumlee also maintains that the decision was made in February 2019, with only the timing of notifying Wilson of his termination being under discussion at subsequent meetings.  Appendix to Reply at 177, 180-83.

Wilson also speculates that Dinan divulged Wilson's cancer diagnosis to other L&B employees.  Brief in Support of Response at 42-43.  However, Dinan denies that she shared Wilson's cancer diagnosis with Smith or Plumlee.  Appendix to Motion at 126.  Additionally, Smith asserts that Dinan only notified him of Wilson's

FMLA leave in March 2019, one month after the decision to terminate Wilson was already made, prompting the discussion to postpone informing Wilson of his termination until after he returned.  Appendix to Response at 185-86.  Dinan avers that she met with Smith and Plumlee in preparation for the April management committee meeting and informed them only that Wilson was on FMLA leave and that "any decisions to continue on letting Terry go would have to be on pause until he was clear to return to work after FMLA leave." *Id.* at 81; Brief in Support of Response at 18.

Wilson did not tell anybody in the office about his cancer diagnosis besides Dinan, and cannot point to competent summary judgment evidence suggesting that Dinan told anybody at L&B that Wilson had been diagnosed with cancer.  *See* Appendix to Motion at 33.  In support of his contention that the decision to eliminate his position was "ostensibly made" during the June 10 management committee meeting, Wilson points to the letter informing him of his termination that is dated June 19, 2019.  *See* Brief in Support of Response at 19; Appendix to Response at 277.  Wilson also points to the April 2019 management committee meeting minutes noting that "realignment of retail staffing" was discussed as evidence that the decision to terminate Wilson must have been made during this meeting.  *See* Appendix to Response at 255.  Conclusory allegations are not competent summary judgment evidence, and are thus insufficient to defeat a summary judgment motion.

-53-

See *Eason*, 73 F.3d at 1325.  Unsupported speculation, assertions, or inferences are also not competent summary judgment evidence.  See *Forsyth*, 19 F.3d at 1533.  The fact that he was informed of his termination in June does not support the contention that the decision to terminate him must have been made in June as well.  Further, Wilson has failed to show how the "realignment of retail staffing" must mean that the decision to terminate him was made during this meeting.  *See* Appendix to Response at 255.  Nothing else in the minutes suggest that the decision to terminate Wilson was made during this meeting, and his name is not mentioned.  *Id.*

Wilson speculates that Dinan must have informed the management committee members of Wilson's cancer diagnosis, yet points to no evidence supporting such speculation.  Smith and Plumlee maintain that they were unaware of Wilson's cancer diagnosis until litigation ensued and Dinan maintains that she did not divulge Wilson's cancer diagnosis to the management committee members.  Appendix to Motion at 126; Appendix to Response at 185; Appendix to Reply at 186.  Similarly, Wilson fails to point to competent summary judgment evidence refuting the sworn deposition testimony of Dinan, Smith, and Plumlee that the decision to terminate Wilson was made in February 2019, one month before Wilson informed Dinan of his cancer diagnosis and need for FMLA leave.

When the "[p]laintiff did not even request leave until after the decision was made to fire [him]," and there is "uncontradicted evidence that the determination of

termination was made before [his] request," the plaintiff has failed to meet his burden.  See *Armstrong v. Boehringer Ingelheim Pharmaceuticals, Inc.*, No. 3:08-CV-1458-O, 2010 WL 2540751, at \*19 (N.D. Tex. June 21, 2010) (O'Connor, J.).  Wilson's cancer diagnosis and subsequent FMLA leave request occurred after the February 2019 meeting where the competent summary judgment evidence shows that the decision to eliminate his position was made.  Therefore, his cancer diagnosis and subsequent medical treatment could not have been discussed at that time.  Wilson fails to show that a genuine issue of material fact exists as to when the decision to terminate Wilson was made.  Wilson has not established a causal link between his taking FMLA leave and his discharge and cannot make out a *prima facie* case of retaliatory discharge under the FMLA.

Even if the court assumed that Wilson could establish a *prima facie* case of retaliation under the FMLA, the court has already determined that the defendants put forth a legitimate, non-discriminatory reason for Wilson's termination, and Wilson's proof failed to show that this proffered reason was merely a pretext for unlawful discrimination.

Viewing the summary judgment evidence in the light most favorable to Wilson as the nonmovant, the court finds that Wilson has not met his burden of presenting a genuine issue of material fact whether the defendants denied him the benefits to which he was entitled under the FMLA or retaliated against him for exercising rights

-55-

under the FMLA.  Therefore, the defendants' motion for summary judgment on

Wilson's FMLA claim is granted.

### D.  ERISA

Section 510 is ERISA's prohibition on retaliation.  It reads:

> It shall be unlawful for any person to discharge, fine,
> suspend, expel, discipline, or discriminate against a
> participant or beneficiary for exercising any right to which
> he is entitled under [ERISA] . . . .

29 U.S.C. § 1140.

To succeed on a section 510 claim, a plaintiff must prove that he was fired

either (1) in retaliation for exercising a right under ERISA or (2) for the purpose of

prohibiting him from attaining benefits he would otherwise have been entitled to

under an employee benefit plan.  *Holtzclaw v. DSC Communications Corp.*, 255 F.3d

254, 260 (5th Cir. 2001).  A plaintiff must show that the defendants had the

"specific intent to violate ERISA."  *Clark v. Resistoflex Co.*, 854 F.2d 762, 770 (5th

Cir. 1988) (quoting *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3rd Cir.), *cert.*

*denied*, 484 U.S. 979 (1987)).  "[W]here the only evidence that an employer

specifically intended to violate ERISA is the employee's lost opportunity to accrue

additional benefits, the employee has not put forth evidence sufficient to separate

that intent from the myriad of other possible reasons for which an employer might

have discharged him."  *Resistoflex Co.*, 854 F.2d at 771.

In order to survive summary judgment, Wilson must make a showing sufficient to establish that a genuine issue exists as to the defendants' specific intent to retaliate against him for exercising his ERISA rights or to prohibit or interfere with his attainment of any right to which he may be entitled.  See *McGann v. H & H Music Co.*, 946 F.2d 401, 404 (5th Cir. 1991), *cert. denied*, 506 U.S. 981 (1992).

Wilson maintains that he can establish sufficient circumstantial evidence that the defendants had the specific intent to deprive him of continued access to health coverage and reap the resulting savings from their self-insured healthcare plan.  Brief in Support of Response at 50.  Wilson contends that a reasonable jury could find that Smith knew of Wilson's need for additional treatment at the time the defendants decided to terminate him.  *Id.* at 51.  However, Wilson has failed to produce deposition testimony or other competent summary judgment evidence supporting such a contention.

Wilson also argues that the fact he received notice of his termination approximately one month after his use of employee benefits, by which time he would have been noted in the iCAF report as a high-cost claimant, establishes a fact issue concerning the timing of the decision to terminate him due to the close proximity of when he believes the decision to terminate him was made and his use of employer health benefits.  *Id.* at 50-51.  However, as previously discussed, the competent summary judgment evidences establishes that the decision to terminate Wilson was

made in February 2019, one month before his cancer diagnosis.  Therefore, the

defendants would not have been able to suspect or know that Wilson would be

utilizing medical benefits for cancer treatment at the time L&B made the decision to

discharge him.  The defendants also voluntarily paid Wilson's COBRA benefits for

six months after his position was eliminated and further maintain that the money the

firm dedicates to employee benefits is completely restricted.  Motion at 2-3.

Wilson also alleges that a number of other pieces of circumstantial evidence

support his contention that the defendants had the necessary specific intent to

violate ERISA.  For instance, Wilson argues that the fact that one of Dinan's goals as

L&B's HR Director was to reduce overall employer health care spending, combined

with the fact that Wilson appeared on the high-cost claimant report in 2019 and that

Dinan had closed-door meetings with Smith and Plumlee regarding Wilson's medical

leave and subsequently led the effort to "realign" the department, shows that the

defendants had specific intent to interfere with Wilson's ERISA benefits.  Brief in

Support of Response at 50-51.  These conclusions are highly speculative and are not

supported by competent summary judgment evidence.  "A party against whom

summary judgment is ordered cannot raise a fact issue simply by stating a cause of

action where defendants' state of mind is a material element."  *McGann*, 946 F.2d at

408 (citing *Resistoflex Co.*, 854 F.2d at 771).  "'There must be some indication that he

can produce the requisite quantum of evidence to enable him to reach the jury with

his claim.'" *Resistoflex Co.*, 854 F.2d at 771 (quoting *Hahn v. Sargent*, 523 F.2d 461,

468 (1st Cir. 1975), *cert. denied*, 425 U.S. 904 (1976)).

There is nothing in the record to suggest that the defendants were motivated

to terminate Wilson in order to retaliate against him for utilizing his ERISA benefits

or to interfere with or prohibit his use of benefits to which he was entitled.  Dinan's

overarching concern for overall company healthcare spending does not establish that

the defendants terminated Wilson because of concerns about the cost of his medical

benefits.  See *Unida v. Levi Strauss & Co.*, 986 F.2d 970, 980-81 (5th Cir. 1993)

(finding that the employer's awareness that pension and benefit expenses were

increasing, and that a plant closure would cut some benefit expenses does not suggest

discriminatory intent).  Additionally, Wilson himself asserts that he did not talk to

anybody at L&B about his cancer besides Dinan.  Appendix to Motion at 33, 73.

Viewing the summary judgment evidence in the light most favorable to Wilson

as the nonmovant, the court finds that Wilson has not met his burden of presenting a

genuine issue of material fact whether the defendants fired him either in retaliation

for exercising a right under ERISA or for the purpose of prohibiting him from

attaining ERISA benefits.  Wilson has failed to present evidence that the defendants

possessed any of the "specific intent to violate ERISA" required by the case law.

Consequently, Wilson has failed to offer evidence sufficient to make a *prima facie* case

on his ERISA claim; therefore, the defendants' motion for summary judgment on

Wilson's ERISA claim is granted.

E.  TCHRA Age Discrimination Claim

The Supreme Court of Texas described the TCHRA in age-discrimination

cases, noting its parallel to federal anti-discrimination statutes like the ADEA:

> Under the TCHRA, "an employer commits an
> unlawful employment practice if because of race,
> color, disability, religion, sex, national origin, or age
> the employer ... discharges an individual or
> discriminates in any other manner against an
> individual in connection with compensation or the
> terms, conditions, or privileges of employment."
> Section 21.051 is effectively identical to Title VII,
> its federal equivalent, except that Title VII does not
> protect against age and disability discrimination.
> (Those forms of discrimination are addressed in
> separate statutes.) Because one of the purposes of
> the TCHRA is to "provide for the execution of the
> policies of Title VII of the Civil Rights Act of 1964,"
> we have consistently held that those analogous
> federal statutes and the cases interpreting them
> guide our reading of the TCHRA.

*Mission Consolidated Independent School District v. Garcia*, 372 S.W.3d 629, 633-34

(Tex. 2012) (footnotes and internal citations omitted).

In a case like this, where the court already determined that the plaintiff has

not put forth any direct evidence of discrimination, forcing the plaintiff to rely on

circumstantial evidence, Texas courts apply the same *McDonnell Douglas* burden-

shifting framework to age-discrimination claims brought under the TCHRA as federal courts apply to claims brought under the ADEA. *See id.* at 634.

Under the *McDonnell Douglas* framework, a plaintiff is entitled to a "presumption of discrimination" if he can meet the " 'minimal' initial burden" of establishing a *prima facie* case. *Reed*, 701 F.3d at 439 (citing *Garcia*, 372 S.W.3d at 633-34). "Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at this stage of the case 'is not onerous.'" *Id.* (quoting *Burdine*, 450 U.S. at 253). "To establish a violation of the Act, a plaintiff must show that he or she was (1) a member of the class protected by the Act, (2) qualified for his or her employment position, (3) terminated by the employer, and (4) treated less favorably than similarly situated members of the opposing class." *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008). If the plaintiff successfully puts forth his *prima facie* case, the "burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action." *Black v. Pan American Laboratories, L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011). If the employer meets its burden, then the burden shifts back to the plaintiff to make an ultimate showing of intentional discrimination. *Reed*, 701 F.3d at 439. Only at the final "pretext" stage of the *McDonnell Douglas* analysis do the federal and state laws provide different standards. *Goudeau*, 793 F.3d at 474. Under the TCHRA, the plaintiff can demonstrate a genuine issue of material fact that his employer intentionally

-61-

discriminated against him by showing "either (1) the reason stated by the employer was a pretext for discrimination, or (2) the defendant's reason, while true, was only one reason for its conduct and discrimination is another motivating factor ('mixed motive')." *Michael v. City of Dallas*, 314 S.W.3d 687, 691 (Tex. App. – Dallas 2010, no pet.).

The defendants argue that Wilson cannot make out a *prima facie* case of age-discrimination under the TCHRA because he cannot show that he was terminated because of his age or "treated less favorably than similarly situated members of the opposing class." Brief in Support of Motion at 12;  see *Reyes*, 272 S.W.3d at 592. Wilson alleges that Aburrow, Ellis, and Formanek were similarly situated to Wilson at the time his position was eliminated and that they were treated more favorably than Wilson because their positions were not eliminated while Wilson's position was. Brief in Support of Response at 39-40.  The defendants maintain that Aburrow, Ellis, and Formanek were not similarly situated to Wilson because they held different positions with different responsibilities, duties, compensation and benefits and were also subordinate to Wilson.  Appendix to Reply at 184.

Wilson has failed to put forth a *prima facie* case of age discrimination under the TCHRA because he has not shown that he was "treated less favorably than similarly situated members of the opposing class." See *Reyes*, 272 S.W.3d at 592.

The competent summary judgment evidence supports the defendants' assertion that Aburrow, Ellis, and Formanek were not similarly situated to Wilson at the time Wilson's position was terminated.  Before Wilson was terminated, he held the position of Vice President while Aburrow, Ellis and Formanek were retail asset managers.  Appendix to Motion at 49, 55-56.  Further, Wilson directly supervised Formanek and also provided feedback on Aburrow's and Ellis's performance reviews. *Id.* at 21-22, 50, 56.  Additionally, and critically, they performed different job duties such as ARGUS valuations and modeling, were paid less than Wilson, and received different benefits.  *Id.* at 5-7, 97, 123.  Employees are "not similarly situated when, compared to the plaintiff, the employees have different work responsibilities or different supervisors . . . ."  *Hoffman v. Baylor Health Care System*, 597 F. Appx. 231, 236 (5th Cir.), *cert. denied*, 557 U.S. 818 (2015).  A supervisor and his subordinates are not similarly situated.  See *Amezquita v. Beneficial Texas, Inc.*, 264 F. Appx. 379, 386 (5th Cir. 2008) (finding that the distinction between a branch manager and his supervisor "has been held sufficient to establish that two persons are not similarly situated").

Even if the court assumes that Wilson has established a *prima facie* case of age discrimination under the TCHRA, the court has already determined that the defendants successfully set forth a legitimate, non-discriminatory reason for Wilson's termination.  Additionally, the court has already determined that the plaintiff has

failed to show that "the reason stated by the employer was a pretext for discrimination." *Michael*, 314 S.W.3d at 691.  For the reasons stated below, the court now also finds that the plaintiff has failed to show that "the defendant[s'] reason, while true, was only one reason for its conduct and discrimination is another motivating factor . . . ." *Id.*

The TCHRA requires the plaintiff to show that age was at least a "motivating factor" in the defendants' decision to terminate the plaintiff.  *Reed*, 701 F.3d at 440 (citing *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001); see also *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 607 (5th Cir. 2007) ("Under the Texas statute, to establish an unlawful employment practice, [the plaintiff] need only prove that discrimination was 'a motivating factor' in the employer's decision . . . rather than a 'but for' cause as Title VII requires.") (internal citations omitted)).  Wilson alleges that his age was a motivating factor in his termination because, in the context of discussing succession planning and informing Wilson that the "next gen" ask about these plans, Smith allegedly told Wilson that his intent to work for another five to six years did not work for L&B.  Brief in Support of Response at 7.  Wilson also points to Dinan's tracking of employees at or nearing Medicare age as evidence that age was a motivating factor in his termination. *Id.* at 8.

-64-

First, the defendants urge that Smith's reference to the "next gen" in his email to Wilson regarding their lunch meeting does not show any discriminatory animus. Brief in Support of Motion at 13; Appendix to Motion at 71. In the email, Smith says that "[s]uccession planning is something that I'm a nerd about . . . the spot light on this topic has grown even brighter as our clients and our next gen both ask about these plans." Appendix to Motion at 71. Smith goes on to inform Wilson that Smith assisted in "7 senior executives plans involving a spectrum from an immediate good bye at some specified forward looking date to step-downs over a specified period of time, etc." *Id.* Nothing in this email indicates that Wilson's age motivated L&B to eliminate his position. Given that Smith had already assisted seven other senior executives in creating their own succession plans, it is less likely that Smith was targeting Wilson to create a succession plan as a method of terminating him because of his age. This is further supported by Dinan's contention that the reason she tracked those at or nearing Medicare age was not because L&B had a vision of getting rid of its older employees, but rather out of concern that those nearing retirement age who "did not have anyone on their team to potentially back them up" and support their role if they left and could at any moment leave L&B. *See* Appendix to Response at 63. Similarly, Wilson cannot point to any comments referencing Wilson's age at all, let alone in a stereotypical or derogatory way. Wilson was asked to complete a succession plan because, like other employees asked to complete plans at the same

time, he was a senior executive at L&B.  L&B's focus on succession planning is "a way for the [f]irm to ensure that it is complying with its fiduciary obligations to its clients and employees by having a plan for a potential immediate departure of an employee and a long-term plan for a potential departure in the future."  Reply at 7; Appendix to Motion at 68, 138.  Wilson's subjective belief that his age was a motivating factor in his termination is insufficient.

In addition, it is unlikely that L&B would hire Wilson at 57 years of age only to terminate him because he reached 64 years of age.  Appendix to Motion at 2-3; Complaint at 2.  Wilson was well within the protected class at the time of his hire which makes it less likely that his age was a motivating factor in his termination.  Wilson's contentions are also weakened by the "same actor inference" adopted by the Fifth Circuit in *Brown v. CSC Logic, Incorporated*.  82 F.3d 651, 658 (5th Cir. 1996).  "[A] strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."  *Proud v. Stone*, 945 F.2d 796, 797-98 (4th Cir. 1991).  While the same-actor inference will "not automatically dispose of a plaintiff's discrimination claim," it supports the defendants' contention that age was not a motivating factor in their decision to terminate Wilson.  See *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 901 (E.D. Tex. 2004).  Smith, Plumlee, and Gerdes were involved in the decisions to both hire Wilson and ultimately eliminate his position.  Appendix to Motion at 111-12, 136.  In fact, half of those involved in the

-66-

decision to hire Wilson were his age or older, which further demonstrates that age was not a motivating factor in the defendants' decision to terminate Wilson. *Id.* at 2-3, 139.

Wilson failed to make out a *prima facie* case of age discrimination under the TCHRA because he could not point to a similarly situated employee who was treated more favorably than him. Additionally, even if Wilson had successfully put forth a *prima facie* case, he also failed to show that age was a motivating factor in the defendants' decision to terminate him or, as previously discussed, that the defendants' proffered reason for his termination is mere pretext for discrimination. Therefore, the defendants' motion for summary judgment on Wilson's TCHRA age-discrimination claim is granted.

## F.  TCHRA Disability Discrimination Claim

At summary judgment, a disability discrimination claim under the TCHRA is also analyzed under the *McDonnell Douglas* burden-shifting framework. *Schutze v. Financial Computer Software, LP*, No. 3:04-CV-0276-H, 2006 WL 2842008, at *4 (N.D. Tex. Sept. 29, 2006) (Sanders, J.) (citing *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003)). To make out a *prima facie* case of discrimination, the plaintiff must establish "that: (1) he is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his

-67-

disability; and (4) he was replaced by or treated less favorably than non-disabled

employees." *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 992 (W.D. Tex. 2012)

(citing *McInnis v. Alamo Community College District*, 207 F.3d 276, 279-80 (5th Cir.

2000) (citations omitted)); see also *Herrera v. CTS Corp.*, 183 F. Supp. 2d 921, 925

(S.D. Tex. 2002) (noting that the TCHRA is interpreted in the same way as the

Americans with Disabilities Act ["ADA"] ); *NME Hosps., Inc. v. Rennels*, 994 S.W.2d

142, 144 (Tex. 1999) (quoting *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483,

485 (Tex. 1991) (noting that the TCHRA purports to correlate "state law with

federal law in the area of discrimination in employment").  Then, "[a]ssuming the

plaintiff meets his prima facie burden, the burden shifts to the employer to articulate

a legitimate non-discriminatory reason for its differential treatment of the employee."

*Donaldson v. Texas Department of Aging & Disability Services*, 495 S.W.3d 421, 437

(Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *McDonnell Douglas*, 411

U.S. at 802).  "The employer's offer of a legitimate reason eliminates the

presumption of unlawful discrimination created by the plaintiff's prima facie showing

and leaves the plaintiff with his ultimate burden to prove that the employer's

explanation notwithstanding, it engaged in intentional discrimination."  *Id.* (citing

*Texas Department of Family & Protective Services v. Howard*, 429 S.W.3d 782, 786–87

(Tex. App.–Dallas 2014, pet. denied)).

-68-

The defendants maintain that the plaintiff has not put forth a *prima facie* case of disability discrimination under the TCHRA because he cannot satisfy the third and fourth elements – that "he was subjected to an adverse employment action on account of his disability" or that "he was replaced by or treated less favorably than non-disabled employees," see *Molina*, 840 F. Supp. 2d at 992, because the decision to terminate Wilson was made before he notified anybody at L&B about his diagnosis. Brief in Support of Motion at 17.

The court has already determined that the competent summary judgment evidence supports the defendants' contention that the decision to eliminate Wilson's position was made in February 2019.  Appendix to Motion at 105, 117, 127-29. Wilson has failed to show a genuine issue of material fact on this critical point. Wilson did not inform Dinan of his cancer diagnosis until March 25, 2019, after the employment decision was already made in February 2019.  *Id.* at 30-31, 121-22, 124. Further, Wilson admits that he did not share his diagnosis with anyone at L&B besides Dinan and Dinan insists that she did not share Wilson's diagnosis with Smith or Plumlee.  *Id.* at 33, 126.  Therefore, Wilson cannot show a genuine issue of material fact that the defendants had the knowledge necessary to establish the requisite causal connection to make out his *prima facie* disability discrimination claim under the TCHRA.

The court also finds that Wilson failed to show that he was "replaced by or treated less favorably than non-disabled employees."  See *Molina*, 850 F. Supp. 2d at 992.  "To establish this element of the prima facie case, [the plaintiff] must either show that []he was replaced by a non-disabled employee or that []he was 'treated differently under circumstances nearly identical to [his].'"  *Miles-Hickman v. David Powers Homes, Inc.*, 589 F. Supp. 2d 849, 866 (S.D. Tex. 2008) (citing *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995)).  The defendants contend that Wilson cannot establish this element because he cannot point to another employee who, under "nearly identical" circumstances as Wilson was treated more favorably.  Brief in Support of Motion at 18; see *Miles-Hickman*, 589 F. Supp. 2d at 866.  Wilson asserts that he satisfied this element because he was replaced by Aburrow, a non-disabled employee and the defendants "displayed substantial favoritism towards Aburrow and Formanek – younger, non-disabled employees." Brief in Support of Response at 39.

The court has already determined that Wilson failed to show that he was replaced by Aburrow or any other employee.  Similarly, Wilson has failed to show that the defendants treated another employee more favorably than Wilson under nearly identical circumstances.  Wilson has not pointed to any other employee who, operating under "nearly identical circumstances" to Wilson was treated more favorably.  See *Miles-Hickman*, 589 F. Supp. 2d at 866.  As the court already

discussed, Aburrow and Formanek are not proper comparators to Wilson because Wilson had supervisory authority over them, they performed different job duties under different titles and were paid significantly less than Wilson.  Appendix to Motion at 21-22, 49-50, 55-56; Appendix to Response at 131-32; Appendix to Reply at 184.  The fact that the defendants terminated Wilson but kept Aburrow and Formanek, younger non-disabled employees, is not sufficient on its own to establish a *prima facie* case of disability discrimination under the TCHRA.  Because Wilson has not shown that he was terminated "on account of his disability" or "replaced by or treated less favorably than non-disabled employees" he has failed to put forth evidence creating a genuine issue of material fact as to two elements of a *prima facie* of disability discrimination under the TCHRA.  See *Molina*, 850 F. Supp. 2d at 992.

Even if the court assumes that Wilson can put forth a *prima facie* case, the court has already determined that the defendants successfully proffered a legitimate-nondiscriminatory reason for Wilson's termination and Wilson failed to show that this proffered reason is mere pretext for discrimination.  Therefore, the defendants' motion for summary judgment on Wilson's TCHRA disability-discrimination claim is granted.

## III.  <u>CONCLUSION</u>

For the reasons stated above, the defendants' motion for summary judgment is **GRANTED**.  Judgment will be entered for the defendants.

**SO ORDERED.**

January ⟨11⟩, 2022.

_____
A. JOE FISH
Senior United States District Judge